## James Kelly, Administrator, etc., v. George Hendrie.

*Charge to the jury: Special instructions superseded.* Where a case has been given to the jury with special instructions, but, upon the jury coming in without having agreed, these instructions are recalled, and the jury are charged, in substance, to find for the defendant, and they return a verdict accordingly, these special instructions are thereby superseded, and will not be reviewed on error; the verdict was not found on them, and if incorrect, they worked no legal prejudice to the plaintiff.

*Charge to the jury: Evidence.* Where the jury have been directed, in substance, to find for the defendant, if the evidence upon any point essential to a recovery is open to but one meaning, and that meaning is plainly and necessarily adverse to the plaintiff, then he has no ground of complaint.

*Contributory negligence.* In an action by an administrator to recover damages for the negligent killing of his intestate, by running over him with a street car, if the negligence of the deceased contributed to the injury, the plaintiff is not entitled to recover.

*Evidence:* *Reasonable care.* The evidence in this case considered, and the conclusion reached, that it did not tend to show that the deceased had exercised that reasonable care to avoid injury which a person of ordinary prudence would have exerted under the circumstances; that the plaintiff was not, therefore, entitled to recover, and that the direction to the jury to find for the defendant, was not erroneous.

*Submitted on briefs October 31. Decided November 23.*

Error to Wayne Circuit.

*Van Dyke & Brownson,* for plaintiff in error.

*J. Logan Chipman,* for defendant in error.

GRAVES, J.

This action was brought to recover damages for the benefit of the widow and next of kin of John Mahan, whose death is alleged to have been caused by the negligence and default of the defendant, as lessee of a street railway.

The evidence having been put in, the case was given to the jury with numerous special instructions, but the jury afterwards coming in without having agreed, the first instructions were recalled, and the jury were in substance charged to find for the defendant, and they returned a verdict accordingly. We are now asked to review the first instructions, but this we cannot do. The verdict was not found upon them, and if they were incorrect, they worked no legal prejudice to the plaintiff.

The finding was upon the second charge, which superseded the first, and the only question is, whether the plaintiff has any ground of complaint in consequence of the direction to find against him. If, upon any point essential to a recovery, the evidence bearing on it is open to but one meaning, and that meaning is plainly and necessa-

rily adverse to the plaintiff, then he has no ground of complaint.

The material points controverted on the trial were but two, and the affirmative of the issue as to each, was on the plaintiff. It was incumbent upon him to show that the injurious act of which he complained was caused by the negligence or default of the defendant, and that the deceased did not, by any want of proper care on his part, assist in producing it.—*Detroit & Milwaukee Railway Co. v. Van Steinburg, 17 Mich., 99.*

The whole evidence appears in the bill of exceptions, and whether it has any tendency to show actionable fault on the part of the defendant, we need not consider. For the present purpose, the case may be considered as turning on the other point, and in order to elucidate it, such of the circumstances as bear upon it must be examined.

The deceased, being about sixty-three years of age, and in ordinary health and vigor, so far as shown, about three o'clock in the afternoon of the 27th day of March, 1871, walked upon the railway track, on Woodward avenue, a few feet north of the Congress street crossing, when the car was approaching from the south, and not far distant, and encountered the horses and car, and was killed.

The only witnesses for the plaintiff, who were spectators of the event, were James Burns, Daniel Flynn, and Edward J. Warner. Of these the two former were teamsters, engaged in hauling dirt from Moffat's cellar, across the avenue and railway.

Burns states that on going towards the track with his load, he noticed the car approaching from near Jefferson avenue, and as he got near the track he stopped, and looked at the car to see whether he could get across; that he then put on the whip and got across, and had scarcely succeeded when the car passed; that it came

26 MICH.—33.

quicker than he ever saw it before, and he was excited; that on getting across he stopped and looked after the car, and saw the deceased crossing a little distance from the cross-walk; that when he first saw the deceased the car was a good way from him; that he saw the deceased on the track in front of the car horses; that deceased put his hands up against the horses' heads, and was then thrown between the horses' legs, and then got under the car and across the track, and was dead in a second.

Flynn states that his team was the next following that of Burns, and about thirty or forty feet behind; that he noticed no other team; that he looked up and saw the car coming; that he was on his wagon on the Campbell and Linn side of the track, and saw the deceased in the middle of the track before the horses, and saw the horses strike him,.and saw him throw up his hands; that the deceased was then knocked down; that he did not see deceased until his hands were up, and he was working against the horses; that the car ran against the horses and they widened out, and the axle-tree of the car struck deceased.

Warner states that he was on the east side of Woodward avenue and south side of Congress street; that he kept a public dray and had his stand there; that he saw the car coming faster than cars usually go; that he saw deceased when he was about ten feet from the car; that he attempted to cross the street; that he, witness, first noticed that something came in contact with the horses, and then saw something under the horses' feet, but could not at the time tell what it was; that he saw deceased after he got under the horses and after he got under the car.

The witnesses for the defendant, who were spectators of the occurrence, or any part of it, were William Johnson, the conductor, John Patton, the driver, Augustus Thorman, and Mrs. Helen Stewart.

Johnson states that the car, on the trip in question, left the junction of Woodward and Jefferson avenues at three o'clock in the afternoon, and proceeded to the edge of Congress street, where the car stopped to let a dirt wagon pass; that it then started again and proceeded to a point just beyond the north crossing of Congress street and Woodward avenue, between a walk and a trot; that on reaching this point he heard the driver "holler," and felt the brake, which was put on hard; that the car immediately jarred, then jerked ahead, and then stopped; and the witness got off and saw deceased under the car; that the car was not going over three and a half miles an hour.

Patton states that he stopped on the south crossing to let a mud wagon pass, and when that passed started on again; that he then threw his eyes on the west side of the street, and then on the east side, and saw deceased standing in the track before the horses, ten or fifteen feet beyond the north crossing, and about five feet ahead of the team; that his back was towards the witness; that the car was going a slow gait; that he, witness, "hollered" at him, "hey, hey! look out;" that deceased then turned around and threw up his hands, and the horses jumped aside, and deceased then fell on his face, with his head towards the car; that the horses threw themselves apart and gave deceased a chance to fall right ahead; that the horses got excited and jerked the car right on top of him; that he, witness, put the brake on when he "hollered;" that deceased, when witness noticed him and "hollered," was standing still; that he, witness, observed nothing on the track between deceased and the car, except the mud wagon, and noticed the deceased when that passed; that the mud wagon passed when the car was on the south side of Congress street; that after that wagon passed there was nothing to obstruct the view of deceased; that he first saw deceased after pass-

ing the north crossing, and that the accident occurred about fifteen feet from that crossing; that he could not tell what caused the deceased to fall, as the horses did not touch him; that deceased could have got off the track, if he had tried, when he threw up his arms.

Thorman states that he noticed the car when it came on the corner of Congress street and Woodward avenue; that it was then between the two cross-walks, and the horses were going on a very slow trot; that deceased was on the corner of Congress and Woodward, about two feet ahead of witness, and going down the side-walk by the market; that witness started to go down Congress street on the cross-walk, and the car came along, and witness waited for it to pass, and while he was then standing there on the cross-walk, the deceased ran across the road in the middle, and about fifteen or eighteen feet north of the cross-walk; that when deceased came upon the track, the "horses seemed to hurt him;" that is, as the witness afterwards explained, "he lifted his hands up, and the horses went apart not to hurt him," and he then fell between them."

Mrs. Stewart states that she had been shopping at Gunn's store, and had just passed out, when her attention was arrested by the car, and the deceased standing, or trying to stand, and making motions with his body; that he took very short steps on the rail; that he was about a rod north of the crossing, with the car between him and the crossing; that when she first saw him, he was, she thinks, not more than four feet from the horses, and was taking very short steps, and appeared to be trying to cross before the horses, but was taking such short steps that he could not, as the horses were just upon him; that she was right opposite where he was; that there was much noise and voices of people, but she could not distinguish any thing in particular; that only two or three seconds inter-

vened before the deceased fell; that she saw his hands go up a little, but not above his head; that he fell on his face across the track and under the horses; that she could not tell whether he fell by being struck by the horses or by being tripped up.

This is the substance of the testimony on both sides, tending to explain the conduct of the deceased, and rendered in as strong a light for the plaintiff as, the record will authorize. Upon such a state of facts can it be said that there is any thing tending to show that the deceased exercised that reasonable care to avoid injury that a person of ordinary prudence would have exerted? On the contrary, do not the facts, viewed however favorably for the plaintiff, tend to show affirmatively the want of such care?

Here was a broad public street, with a horse railway in the centre, upon which cars were passing every few minutes. The way was visible, and known to all using the street. The fact that the vehicles used upon the way are confined to it and cannot turn to the right or left to avoid pedestrians or teams, was known to every body. It was in the day-time, and there were no obstructions to hinder the deceased from timely observation. If, as represented by two of the plaintiff's witnesses, the car was going at an unusual speed, this circumstance would have been of high importance if Mahan had been upon a street-crossing, where it might have been the custom or the duty of the conductor to check or stop his car; but the unusual speed at this point could only evidence negligence on the part of defendant, and would not excuse Mahan from taking even the ordinary precaution of looking about him when crossing at an unusual place; a precaution that would have been demanded of him even as to ordinary vehicles. He was in a situation to see the track and the approach of the car, by simply looking for the purpose. Others

with teams and on foot, who were very near the deceased, did see and act accordingly.

The deceased, however, deviated from the crossing, abandoned the customary path, took an unusual route, and not one where foot passengers would be naturally expected by the operators of the railway, and apparently attempted to cross a little in front of the horses, when others paused, and was struck.

It is said, that he apparently *attempted to cross the track*, because this explanation of his being upon the track is the most favorable for the plaintiff, and it seems difficult to suppose that he was heedlessly standing, or wandering upon the track, without aim or purpose, Assuming then that he attempted to cross ahead of the car, in the manner and under the circumstances stated, the act was venturesome and imprudent.

It is true, as we know by observation, that persons in situations which make them familiar with these and similar agencies, acquire a degree of hardihood in moving about them, and become inclined to take risks and chances. But positive recklessness of danger cannot alter the essential nature and requirements of that prudence which the law inculcates, and the lucky escapes, however numerous, cannot make the conduct by which the risks are incurred, rationally prudent.

The whole conduct of deceased, as represented by the evidence, appears to have been singular and unusual, and it is quite possible that circumstances not given, would furnish a satisfactory key to it.

As the case stands there is no admissible hypothesis upon which it can be held that his misfortune was not directly chargeable to his want of that care and circumspection which the occasion demanded.

KELLY v. HENDRIE.

The imperative charge was therefore correct, and the judgment should be affirmed, with costs.

COOLEY, J., and CHRISTIANCY, CH. J., concurred.

CAMPBELL, J.

I think there was testimony to go to the jury.