DAVID T. LITTLER

*v.*

WILLIAM JAYNE *et al.*

*Filed at Springfield March 28, 1888.*

1. LETTING PUBLIC CONTRACTS—*of the advertisement—requirement as to description of work, materials, etc.* Where public agents are required to let public work to the lowest responsible bidders, upon notice of the work or material required, such notice should give all the necessary information to enable parties desiring to bid, to make estimates. Resort can not be allowed to merely verbal explanation, to ascertain substantially all that is contemplated to be done, as that might lead to favoritism and other mischief intended to be avoided by the statute.

2. SAME—*under act of 1883 relating to completion of State House—of the contract for statues.* The act of 1883, making an appropriation for the

completion of the State House, provided that all contracts for labor or materials used in the work, requiring the expenditure of more than a given sum, should be let to the lowest responsible bidder or bidders, after advertising for bids or proposals at least thirty days, etc., and provided that all contracts entered into contrary to such act should be null and void. The State House commissioners let a contract for eight statues without having advertised for bids for the same, or giving notice of the materials of which they should be made, and other necessary information, to enable parties to bid understandingly: *Held,* that such contract being let contrary to law, was null and void, and that no voucher should be issued for the price agreed to be paid.

3. LAPSING OF APPROPRIATIONS— *effect of a re-appropriation for the same purpose.* Where the amount of an appropriation of the legislature unexpended is, within the two years, re-appropriated for the same purpose as the original, there will be no lapse of such balance into the State treasury; and this court will take judicial notice of appropriations by the legislature.

4. INJUNCTION—*misapplication of public money.* A bill will lie at the suit of any tax-payer of the State to enjoin the action by public agents or officers which will lead to the misapplication of public money, or the payment of such money on illegal contracts, or without authority of law; and the fact that the Governor's approval of their acts is also necessary to the payment of public money, will afford no sufficient reason against enjoining the illegal action of such public agents.

WRIT OF ERROR to the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Sangamon county; the Hon. JAMES A. CREIGHTON, Judge, presiding.

Messrs. PALMER & PALMER, and Messrs. GREENE & HUMPHREY, for the plaintiff in error.

Mr. GEORGE HUNT, Attorney General, and Messrs. PATTON & HAMILTON, for the defendants in error.

Mr. CHIEF JUSTICE SHELDON delivered the opinion of the Court:

This was a bill filed by the complainant, for himself and all other tax-payers of the State, to enjoin the defendants, State House Commissioners, from making, signing or approving

vouchers for any expense incurred, under a certain contract therein mentioned, for the making of eight electro-bronze statues of public men of the State of Illinois, living and dead, and from using any portion of the money appropriated for the completion of the State House for the purpose of procuring or placing such statues in said building. Answer was filed, proofs taken, and on final hearing the bill was dismissed. The order of dismissal was affirmed by the Appellate Court for the Third District, and this writ of error was sued out by the complainant.

The grounds of the bill are, that the contract was let without advertisement for bids for the work, as required by law, and that the making of such a contract was in excess of the authority of the commissioners.

By two certain acts of the General Assembly of this State, one approved February 25, and the other February 27, 1867, (Laws 1867, pp. 162, 164,) provision was made for the erection of the new State House, at the capital of the State, and commissioners were appointed to superintend the erection of the building. In 1883, the prior appropriations having been exhausted, and the commissioners theretofore appointed, discharged, the General Assembly passed an act, approved June 14, 1883, (Laws 1883, p. 39,) appropriating $531,712, for the purpose of completing said building, and providing for the appointment of commissioners to superintend said work. Under this act the defendants were appointed commissioners. Section 2 of said act of February 27, 1867, provided that all contracts for labor or materials in the erection and completion of said State House, requiring an expenditure of more than $500, should be let to the lowest responsible bidder or bidders, after advertising for bids or proposals for the same, for at least thirty days, in two daily papers published in the city of Springfield and in the city of Chicago, such advertisements to specify the time and place when and where the bids or proposals should be opened; that no bids or proposals should be opened at any other time and place, and that all bids or proposals received

by the commissioners for labor or materials, should be filed by the commissioners in the office of the Secretary of State, whether the same should be accepted or rejected. The last clause of section 1 of the act was as follows: "And all contracts made or entered into contrary to the provisions of this act shall be null and void." By an amendatory act, approved June 14, 1871, (Laws 1871-2, p. 165,) said limit of $500 was extended to $2500, and the commissioners were "authorized, at any subsequent letting of the work, after having advertised in the manner now provided by law, to make and enter into contracts for the whole or any portion of the materials and labor that may be required in each class of work to be placed under contract, * * * and specified in their advertisement."

The contract in question was made with Poulson & Eger, and is for eight copper-bronze statues, made by the galvanoplastic process, from models furnished them, each to be ten feet high, for the sum of $7600. The cost of the models to be furnished by the commissioners was $2400, making the aggregate cost of the statues $10,000. All the advertisement there was in relation to the matter was the following, published in two daily newspapers of Springfield and Chicago, for more than thirty days prior to the letting of the contract to Poulson & Eger, viz.:

"*Notice to Contractors.*—Sealed proposals for finishing the unfinished portions of the Illinois State House will be received by the State House Commissioners, at their office in the Capitol building, at Springfield, until September 1, next, at twelve o'clock M., for the following parts of the work, viz.: For all the cut stone and granite work; for all the marble finish and floor tiling; for the iron inner dome and other ornamental iron work; for the plain and ornamental plastering; for the carpenter work and hard-wood finish; for the plumbing and gas fitting.

"Full particulars as to the before mentioned work can be obtained at the office of the architect, W. W. Boyington, 157

La Salle street, room 107, Chicago, where the plans and speci-
fications can be consulted until the time for receiving proposals.
There will also be copies on file at the commissioners' office,
at Springfield, on and after August 15, 1885. The commis-
sioners reserve the right to reject any or all bids." (Signed
by the commissioners.)

The time here fixed for receiving and opening proposals was
extended to September 10, at twelve o'clock M., and notice
thereof given by publication in like manner. The only speci-
fication relied on as showing anything in relation to the statues
reads as follows :

"*Railings and Facings.*—The present iron and wood railings
around the well-holes on the second and third floor under the
dome will be taken away, and new railings, panel facings and
curbing made in its place. Also, the same pattern will be
made around the second floor of well-holes, the cast-iron to
be of a quality and finish suitable to electro-bronze or bower
burffwork, all of which must be executed in the most thorough
and artistic style of work, according to the balance of work,
as shown by plans and detailed drawings adopted September,
1885, and are now on file in the commissioners' office."

The statues are to stand, respectively, upon the eight corbels
projecting from the wall of the inner dome. There was ex-
hibited, in evidence, an elevation drawing, (not a detail draw-
ing,) of the inner dome of the State House, which showed on
one of these corbels an outline drawing of an imaginary female
figure, which was, by the scale given, ten feet high and three
and a half feet in width across the chest, and beside it, in
lettered words, the statement that "eight corbels are now in
place."

This is all the evidence there is in the case going to show
that the letting of the contract for these statues was advertised,
as required by law. The item in the advertisement which is
relied on by the defendants as embracing these statues, is :

"For the iron inner dome and other ornamental iron work." There is in this no mention of statues, and evidently no sufficient notice to attract the attention of, and invite bids and proposals from, persons engaged in the business of furnishing statuary. The advertisement refers to the plans and specifications, but the specification under the head of "Railings and Facings," which is relied on as helping out the advertisement, lends no aid in that respect, as it is equally wanting with the advertisement in the mention of any statuary. All that there is in the plans and specifications suggestive of any idea of statues, is the elevation drawing showing the outline of an imaginary female figure on one of the eight corbels. This might indicate to a competent architect that the eight corbels were to be supplied with figures of some kind; but as to their finish, the character of the work, of the material of which the figures were to be constructed, who was to furnish the models, no information whatever was afforded by this elevation drawing, nor by it taken in connection with the advertisement and specifications. These were elements as to which there was necessity of information, in order for the making of any intelligent bid or proposal for doing the work. This is not only obvious, but the whole testimony in the case, that of experts as well, is, that the advertisement, taken in connection with the plans and specifications and this elevation drawing, is wholly insufficient for the making of an intelligent bid for the construction of these statues in question; that in order to that, verbal explanation, in addition, would be requisite. And it is insisted that that is sufficient, if the needed information might have been obtained through verbal explanations. To allow such resort to verbal explanations for information, at least to the extent that would be necessary in this case, would be inconsistent with the policy of the statute requiring public notice to be given of the letting of contracts for public work, and would tend to the admission of the mischief the statute was designed to remedy. The object of the statute is, that

there should be notice, in writing, of the work to be contracted for, given by publication, to secure full and fair competition and prevent favoritism. Verbal explanations might vary with different persons, and thereby bidders be made to stand not on the same equality, and there might, in this way, be afforded an opportunity for the exercise of favoritism. If an advertisement, "For the iron inner dome and other ornamental iron work" of the State House, may be eked out, by verbal explanations, so as to be made to include the work and materials of eight copper-bronze statues made by the galvano-plastic process from models furnished the contractors, then the statute requiring that all contracts for labor or materials in the completion of the State House shall be let to the lowest responsible bidder, after advertising for bids or proposals for the same for at least thirty days in newspapers named, is a delusion.

The advertisement in this case was not only calculated to deceive and mislead the public, but it actually did have that effect. Mr. Mullins, of the firm of Bakewell & Mullins, of Salem, Ohio, whose business is manufacturers of metal statuary, testifies that he came to Springfield for the purpose of bidding on the ornamental iron work of the inner dome of the new State House; that he examined thoroughly the elevation drawings and specifications, and there was no mention whatever of statuary, although on one of the elevations was shown an outline tracing of a female figure; that he had no notice of the letting of any statuary, but, on the contrary, was informed by one of the commissioners, whom he met in a room in the Capitol building, where drawings were on exhibition, that the statues, the tracing of one of which was shown on elevation of inner dome, were to be made of plaster. He also testifies that had he known of the letting of this statuary, he would have bid for the same, as his firm were particularly anxious for that kind of work,—made a specialty of it. The witness Louis Pfaw, general manager of the Ætna Iron Works of Quincy, Illinois, testifies that he carefully examined the

9—124 ILL.

specifications, plans and elevation drawings in this case, in order to bid on certain portions of the iron work of the interior of the dome; that he could not bid, intelligently or otherwise, for the construction of these statues from the specification and elevation drawing; that the specifications and plans did not include or contemplate the construction of such statues.

It was important that the material of which the statues were to be made, should have been advertised, in order for intending bidders to be able intelligently to make their bids and proposals for the construction of the statues. It is obvious, as the proof shows, that the cost of the statues would be dependent upon the material of which they were composed, and would vary very greatly, according to the kind of material, whether marble, plaster, bronze, sheet-iron, cast-iron, cast-zinc, etc. Mr. McCreery, one of the commissioners, testifies: "We didn't determine to put up these statues until after the contracts were awarded." Mr. Boyington, the architect for the work of completing the building, testifies, that "it was not till after their bid (Poulson & Eger's) was in, that we determined to adopt this particular kind of metal for these statues." The original bid of Poulson & Eger, produced in evidence, bears date, "New York, September 9, 1885." The time limited for receiving and opening bids was September 10, 1885, at twelve o'clock M. The contract was actually let to Poulson & Eger, September 11, 1885. How is it possible to regard the contract here as let in compliance with the statute requiring that all contracts for labor or materials shall be let after advertising for bids for the same for thirty days, when the materials, the kind of which was of such vital consequence for the making of the contract in question, were not determined upon at the time of inserting the advertisement, and not until just before the opening of the bids and the letting of the contract? How could work and materials not known and determined upon, be advertised and intelligently bid for? The bid of Poulson & Eger was the only one made for the statues. The contract price,

the proof shows, was some $2800 or $3000 more than the reasonable value. How could the kind of the material, the character of the work, who was to furnish the models, as described in the contract, have been ascertained and settled upon except through private negotiation?

We regard this contract with Poulson & Eger for these statues as essentially a private contract made with them, and not as having been publicly let in compliance with the statute, but let contrary to its provisions, and we must hold the same, therefore, to be null and void.

Exception is taken to the remedy here sought. It is said the bill is in effect to prevent the payment of public money, and that these commissioners have no public money in their possession or under their control. Although that may be, yet if the action of the commissioners which it is sought to have restrained would be an authority for, and undoubtedly lead to, the payment of public money thereunder, we think such action might properly be restrained, by way of prevention of the misappropriation of public funds.

It is said, the Governor's approval of the commissioners' vouchers is necessary for the drawing of any money thereunder, that such power of approval is a sufficient protection for the tax-payer, and that the injunction asked for would be an improper interference with the duty of the executive in the exercise of such power of approval. If it were a case where a gross and palpable breach of law was apparent, this power of approval might be a sufficient reliance against the making of any payment under an illegal voucher of the commissioners. But in a case of such doubt as appears here, there having been a contrary determination by two other courts, the Governor might take the view that there was a judicial question involved, which might more properly be referred to the judicial department of the government to settle, and so add his sanction to what had been certified to by the commissioners under the responsibility of their official duty. We see no interference

in the case with executive duty. No occasion for executive
action arises until vouchers from the commissioners are pre-
sented for approval. Enjoining the issuing of the vouchers
is but the decision, by the court, of a judicial question prop-
erly presented to it, antecedent to any vouchers being issued.
There is no requirement of law that vouchers shall be issued or
shall be presented to the Governor for approval. Only, such
vouchers and approval must be obtained before any money can
be drawn from the treasury on the accounts of expenditure.

There is evidently nothing in the point that all that part of
the appropriation for completing the State House, made June
14, 1883, unexpended September 30, 1885, had, before this
bill was filed, October 2, 1885, lapsed into the treasury, and
could not be drawn therefrom by virtue of or under said act
of June 14, 1883. There was, by the act approved June 29,
1885, a re-appropriation made of the same sum of money
which was appropriated by the former act of June 14, 1883,
so that there could not have been any lapse of money into the
treasury. Although there is no reference in the bill to the act
of June 29, 1885, we take judicial notice of it.

This whole proceeding of the commissioners with respect to
the contract in question, we regard as one in misappropriation
of the public money. Numerous are the cases in this court
where suits have been sustained on the part of tax-payers to
prevent the misappropriation of public funds. (*Colton* v. *Han-
chett,* 13 Ill. 615; *Perry* v. *Kinnear,* 42 id. 160; *Beauchamp*
v. *Kankakee County,* 45 id. 274; *City of Springfield* v. *Edwards,*
84 id. 626.) The present suit we consider one of this class.
The issuing of the vouchers, asked to be restrained, if not a
direct act of such misappropriation, is one in the accomplish-
ing thereof. If the vouchers are issued, there can be no rea-
sonable doubt that payment under them will be obtained, and
thus the misapplication of the public money be effected. If
the vouchers be not issued, no public money can be drawn
under the contract, and the restraining of their issue is in

prevention of the misapplication of public funds. The remedy by injunction we think appropriate, and the only one adequate for the case.

The judgments of the Appellate and circuit courts will be reversed, and the cause remanded to the circuit court of Sangamon county, for further proceedings in conformity with this opinion.

*Judgment reversed.*