Sanitary District of Chicago v. Lee.

# Sanitary District of Chicago, Fred M. Blount, Treasurer, and The Scherzer Rolling Lift Bridge Co. v. George P. Lee.

| 79 | 159 |
| 108 | 78 |
| 79 | 159 |
| 110 | 4520 |
| 79 | 159 |
| 114 | 6289 |
| 114 | 293 |

1. Sanitary District—*Power to Erect Bridges as Compensation to Railroad Companies.*—The Sanitary District of Chicago has the power to erect a bridge and provide for continuously maintaining the same, by way of compensation to a railroad company for crossing its track, section 8 of the act under which the Sanitary District is organized providing that " such sanitary district may acquire by purchase, condemnation or otherwise, any and all real and personal property, right of way and privilege, either within or without its corporate limits, that may be required for its corporate purposes."

2. Same—*Condemnation of Property Held for Public Use.*—Section 17 of the act creating the Sanitary District of Chicago, authorizing such district to enter upon property held for public use, and acquire the necessary right of way, and providing that the public use thereof shall not be unnecessarily interrupted or interfered with, and that the same shall be restored to its former usefulness as soon as practicable, etc., applies to railroads as public highways of the State.

3. Same—*Contracts to be Let to the Lowest Bidders.*—The object of section 10 of the act creating the Sanitary District of Chicago, requiring contracts to be let to the lowest responsible bidder, is to secure full and fair competition and render favoritism impossible.

4. Same—*Spirit and Intent of the Act.*—The spirit and intent of section 11 of the act creating the Sanitary District, is that such district shall so advertise the work to be let, and provide proposals therefor that nothing will be left to the discretion of the trustees after the bids shall have been received, except to determine who is the lowest responsible bidder.

5. Same—*Who is the Lowest Bidder.*—The question, who is the lowest bidder, is to be determined by an inspection of the bids and involves no exercise of discretion, but only a comparison of figures. The bidder who has offered to do the work for the smallest sum is the lowest bidder, and, as among bidders equally responsible, the work can not lawfully be awarded to one who is not.

6. Same—*Full and Definite Information to be Given Before Receiving Bids.*—All matters material to the contract to be let must be determined before advertising for bids, and the advertisement, including documents to which it refers, must give full and definite information of the precise work to be done, as a basis for intelligent bidding.

7. Same—*Should Accept a Design Before Advertising for Bids.*—The Sanitary Board should, before advertising for bids. adopt and submit to bidders definite plans and specifications, even though such adoption limits

the scope of competition to one or two persons who are capable of complying with its terms, and in the absence of fraud such choice would not be held illegal on the ground that it offers opportunity for favoritism.

Appeal, from an interlocutory order or temporary injunction restraining the Sanitary District of Chicago and its treasurer from paying money, etc. Entered by the Superior Court of Cook County; the Hon. JOHN BARTON PAYNE, Judge, presiding. Heard in this court at the March term, 1898. Affirmed. Mr. Justice SEARS, dissenting. Opinion filed December 6, 1898.

## STATEMENT.

This is an appeal from an interlocutory order, or temporary injunction, restraining the Sanitary District of Chicago and Fred M. Blount, its treasurer, from paying any money in pursuance of a certain contract between the Sanitary District and the Scherzer Rolling Lift Bridge Company, for the right of way of certain railroad companies. The Sanitary District, for the purpose of obtaining the right of way for the main drainage channel of the district across and through the railroads and right of way of the Pittsburgh, Cincinnati, Chicago and St. Louis Railway Company, the Chicago and Northern Pacific Railroad Company and the Union Stock Yards and Transit Company, made contracts with the railroad companies, severally, by which the companies, and each of them, for certain considerations in said contracts mentioned, granted to the Sanitary District permission to excavate under the right of way and railway tracks of the companies a temporary passage-way for dredges, tugs and scows, and to subsequently enlarge the excavation to the full width of the main channel. The contracts and certain supplements thereto and parts thereof provided that the Sanitary District should, by November 14, 1898, at its own exclusive cost, erect a bridge of a movable type on which to carry the tracks of the railway companies.

The Sanitary District, in addition to erecting the bridge at its own expense, agreed to pay to the companies, on the completion of the bridge, a sum of money, the interest on which, computed at the rate of five per cent per annum,

would be sufficient to defray the cost of the maintenance of the bridge, including all ordinary and necessary special repairs, the amount of such sum of money to be determined by arbitration in a manner prescribed by the contracts. The Sanitary District also agreed that whenever, by deterioration or general insufficiency, it should become necessary to renew the bridge, or any spans thereof, with a new structure, it would, at its own expense, so renew the same on a plan satisfactory to the chief engineers of the companies. It was further provided by the contracts that the design of the bridge should be first approved by the chief engineers of the companies.

Appellant, the Scherzer Rolling Lift Bridge Company, and C. L. Strobel, each owned a design which was patented, and the Sanitary District purchased from the owner of each design an option or right to purchase and use the design of such owner.

The contracts of purchase were made April 8, 1898. The Strobel, Scherzer, and some other designs were accepted by the railway companies in March, 1898, and March 9, 1898, the president of the board of trustees so reported to the board at its meeting of that date. March 30, 1898, and prior to securing the options above mentioned, the Board of Trustees of the Sanitary District passed the following order, which, and the advertisement published in pursuance thereof, are as follows:

" Ordered, that the president and clerk be hereby directed to advertise under the direction of the committee on engineering, for proposals for constructing an eight (8) track railroad bridge, to be erected across the main channel of this district on the line of Campbell avenue, near Thirty-first street, for the use of the railroad companies whose right of way is crossed by the said main channel at the point designated; and that said chief engineer be directed to base the said call for proposals upon the plans furnished under any options that may be secured by this district; and be it further

" Ordered, that the said advertisements recite that bids will be considered upon any design which may be submitted; provided, the bid is accompanied by an acceptance executed

by each of the three railroad companies interested in this structure."

"SANITARY DISTRICT OF CHICAGO."

"TO CONTRACTORS.

"Sealed proposals addressed to the Board of Trustees of the Sanitary District of Chicago and indorsed:

"Proposals for erecting the substructure and the superstructure of a railroad bridge crossing the main drainage channel will be received by the clerk of the said Sanitary District, at Room 1110 Security Building, Chicago, Illinois, until 12 M. (standard time) of Saturday, the 25th day of June, A. D. 1898, and will be publicly opened by said board of trustees at a special meeting held for that purpose, or at the next succeeding regular meeting of the board.

"The bridge for which said tenders are invited is an eight (8) track structure for the use of the Pittsburg, Cincinnati, Chicago and St. Louis Railway Company, Chicago & Northern Pacific Railroad Company, and the Union Stock Yards and Transit Company, on the line of Campbell avenue, in the city of Chicago, and on Contract Section 'O.'

"The work for which said tenders are invited includes the supplying of all materials for the substructure and superstructure of said bridge, according to one or other of two sets of plans furnished by the Sanitary District of Chicago, on the respective designs of C. L. Strobel and of The Scherzer Rolling Lift Bridge Company, and conforming to specifications furnished by the said district.

"Tenders will also be received upon any other design which may be submitted in competition with the two beforementioned designs, provided such tenders are accompanied by written approval and acceptance from each of the three railroad companies interested in his structure; and further provided, that in its design, workmanship, strength and quality of material it conforms to the requirements of the Sanitary District of Chicago.

"Each bid must be accompanied by a certified check or cash to the amount of three thousand ($3,000) dollars.

"All certified checks must be drawn on some responsible bank doing business in the city of Chicago, and be made payable to the order of the clerk of the Sanitary District of Chicago. Said amount of three thousand ($3,000) dollars will be held by the Sanitary District until all of said bids have been canvassed and the contract awarded and signed, the return of said check or cash being conditioned upon the appearance within ten (10) days after receiving notice of

award to him of the bidder to whom the award of said work shall have been made, with bondsmen, and executing a contract with the Sanitary District for the work so awarded, and giving a bond satisfactory to the Board of Trustees for the fulfillment of the contract. The amount of the said bond to be seventy thousand ($70,000) dollars.

" All bids must be upon the blank forms furnished by the Sanitary District.

" No bid will be considered unless the party making it shall furnish evidence satisfactory to the Board of Trustees of his experience and ability in this class of work, and that he can control sufficient capital to enable him successfully to prosecute the same in case the contract therefor shall be awarded him.

" Bidders are required to state in their bids their individual names and places of residence in full.

" Specifications are now ready and plans may be obtained at the office of the Chief Engineer, Room 1010 Security Building, Chicago, Illinois, on or after May 31, 1898.

" The said Board of Trustees reserves the right to reject any and all bids."

" THE SANITARY DISTRICT OF CHICAGO,
" By William Boldenweck,
" President of its Board of Trustees.

" Attest:    JAMES REDDICK, Clerk.

" CHICAGO, April 25, 1898."

The bids were opened by the board of trustees of the district, June 25, 1898, the chief engineer of the district was ordered to summarize and tabulate them, and they were referred to the engineering committee of the board. The summary made by the engineer shows that bids were made by C. L. Strobel, the Edge-Moor Bridge Works, the Scherzer Rolling Lift Bridge Company, the King Bridge Company and the J. G. Wagner Company; that Strobel bid on his own design, and each of the others on the designs owned by it; that the bid of C. L. Strobel was $235,424.50, and was the lowest bid, and that the bid of the Scherzer Rolling Lift Bridge Company was $369,140, or $133,715.50 in excess of the bid of Strobel. The Board of Trustees of the Drainage District, on August 6, 1898, adopted a report of its engineering committee recommending that the contract be awarded to the Scherzer Rolling Lift Bridge Com-

pany, and, by a vote of five ayes to four nays, awarded the contract to that company.   It is averred in the bill, and not denied, that Strobel furnished to the board of trustees evidence satisfactory to the board of his experience and ability in the class of work required, and that he could control sufficient capital to enable him to prosecute the work successfully; also, that he complied with all the requirements of the advertisement in bidding.   It is not claimed that he is not responsible.

The report of the committee on engineering, which recommended the awarding of the contract to the Scherzer Rolling Lift Bridge Company, and which was adopted by the board of trustees, states as a reason for so awarding the contract, that "The design for said structure furnished by the Scherzer Rolling Lift Bridge Company is superior to any other type or design of bridge which has been submitted for the consideration of this committee, and your committee finds that the lowest bidder upon said design is the Scherzer Rolling Lift Bridge Company."

Two members of the committee made a minority report, recommending an award in favor of Strobel, saying, among other things, "Upon opening the bids of June 25, 1898, it was found that the bid of C. L. Strobel was the lowest of all the bids submitted," etc.   Two other members of the committee reported in favor of the Schenke design, owned by the J. G. Wagner Company.   The Board of Trustees of the Sanitary District consists of nine members; five of these signed the majority report, and each of the two minority reports was signed by two of the trustees, from which it appears that the engineering committee of the board consists of the nine trustees, or the whole board. The board, therefore, had under consideration from June 25th till August 6th, the question as to which of the designs bid on, it would adopt.

The affidavit of Isham Randolph, chief engineer of the Sanitary District, filed in support of the answer of the district, contains the following :

"Affiant further says that the comparison of the differ-

ent designs of bridges proposed in competition with each other for the said bridge, and the determination of the best and most economic design of bridge among those acceptable to the said railroad company, is not a matter to be arrived at by computation only, but involves judgment and the weighing of many elements which are not certain, but upon which the judgment of men will to a greater or less extent vary."

An affidavit of seven of the trustees, also filed in support of said answer, contains the following :

" That prior to the publication of the said advertisement, the said board of trustees secured by contract the right and option to use and receive bids upon the designs of C. L. Strobel and the Scherzer Rolling Lift Bridge Co., so as to secure competition in the bids upon such proposed structures. Further, that in order to secure competition upon the said two designs and prevent combination in reference thereto between bidders, it was deemed advisable and to the best interest of the Sanitary District, that the bids should be solicited upon designs for a bridge other than the said two designs, which would be acceptable to the railroad companies as proposed in the contract entered into between the said railroads and the Sanitary District of Chicago.

" That by thus soliciting bids not only upon the said two purchased designs, but also upon any other design acceptable to the said railroads in competition therewith, lower and better bids would be secured upon the said two designs."


F. W. C. Hayes, Seymour Jones and Peck, Miller & Starr, attorneys for the Sanitary District and Fred M. Blount.

Henry W. Magee and Enoch J. Price, attorneys for the Scherzer Rolling Lift Bridge Co.

Henry A. Gardner and Sigmund Zeisler, attorneys for appellee.

Mr. Justice Adams delivered the opinion of the court.

At the threshold of the inquiry, the question is raised whether the Sanitary District has the power to erect, etc.,

a bridge, by way of compensation to the railroads, as provided in the several contracts with the railroad companies. Section 8 of the act under which the Sanitary District is organized provides:

"Such Sanitary District may acquire by purchase, condemnation, or otherwise, any and all real and personal property, right of way and privilege, either within or without its corporate limits, that may be required for its corporate purposes," etc.

It is contended that the power to make compensation by erecting a bridge, etc., can not, on well recognized principles of construction, be held to be included in the word "otherwise," but we do not find it necessary to base the right to so make compensation on the word "otherwise" in section 8.

Section 17 of the act provides:

"When it shall be necessary, in making any improvements which any district is authorized by this act to make, to enter upon any public property, or property held for public use, such district shall have the power so to do, and may acquire the necessary right of way over such property held for public use in the same manner as is above provided for acquiring private property, and may enter upon, use, widen, deepen and otherwise improve any navigable or other waters, waterway, canal or lake; provided, the public use thereof shall not be unnecessarily interrupted or interfered with, and that the same shall be restored to its former usefulness as soon as practicable," etc.

We can not concur in the contention of appellee's counsel that the above quoted words, after the word provided, apply only to "public property" and not at all to "property held for public use." On the contrary, we think that, construing the language strictly and grammatically, the provision applies in terms to property held for public use. Railroads are public highways of the State, and are so declared to be by the Constitution, (Const. Art. 11, Sec. 12), and the Supreme Court so holds, (C. & N. W. Ry. Co. v. City of Chicago, 140 Ill. 309), and the Federal Supreme Court holds the same, as a proposition of general law and without reference to any constitutional provision. Cherokee Nation v. Kan-

sas Railway Co., 135 U. S. 642, 657; Smyth v. Ames, 169 Ib. 466, 544.

The railroads, being public highways, are held for public use, and it is not contended that the acquisition by the Sanitary District of the right of way through the railroad property is not necessary.   The tracks of the railroad companies are now constructed on the solid ground, which, in all human probability, is a permanent foundation; the foundation for the tracks proposed by the contracts with the companies, namely, a bridge to be properly and continuously maintained, is as near an approach to the present foundation as is perhaps practicable, and is, as we think, clearly within the power of the Sanitary District.

Section 11 of the act provides:

" All contracts for work to be done by such municipality, the expense of which will exceed $500, shall be let to the lowest responsible bidder therefor, upon not less than sixty days' public notice of the terms and conditions upon which the contract is to be let having been given by publication in a newspaper of general circulation in said district, and the said board shall have power to reject any and all bids."

It is claimed by appellants' counsel, but we can hardly think seriously, that this section does not apply to the contract for the work in question.   The construction of the bridge is " work to be done " by the Sanitary District, in pursuance of its contracts with the railroad companies; the expense of it will greatly exceed $500; a contract for it is, therefore, within the very letter of the section, and it must be advertised and let as therein provided.

In Littler v. Jayne et al., 124 Ill. 123, the court, commenting on a statute providing that certain public work should be let to the lowest responsible bidder, say: " The object of the statute is, that there should be notice, in writing, of the work to be contracted for, given by publication, to secure full and fair competition and prevent favoritism."

In Wells v. Burnham, 20 Wis. 119, the court say: " The law requiring contracts to be let to the lowest bidder is based upon public economy, and originated, perhaps, in distrust of public officers whose duty it is to make contracts."

Commenting on a similar statute, the court, in Boren et al. v. Commissioners, etc., held that the obvious policy and intention of the statute was to render favoritism impossible.

In Mazet v. Pittsburgh, 137 Penn. St. 548, an act of the legislature, and ordinances passed in pursuance thereof, provided that all contracts in excess of fifty dollars should be let to the lowest responsible bidder, on notice, etc. The court held : " It can not be doubted that the true intent of the act of 1874 and the ordinances passed in pursuance thereof, regulating the awarding of public contracts, is to secure to the city the benefit and advantage of fair and just competition between bidders, and at the same time close, as far as possible, every avenue to favoritism and fraud in its varied forms." Ib. 561–562.

The Constitution of the State of Arkansas contains this provision : " All contracts for erecting or repairing public buildings or bridges in any county, or for materials therefor, or for providing for the care and keeping of paupers where there are no almshouses, shall be given to the lowest responsible bidder, under such regulations as may be provided by law." The court say :

" The constitutional provision was designed to secure economy in the line of public improvements to which it relates. Extravagance therein might arise either from the inattention or incompetency of the contracting officer, and his consequent failure to obtain favorable offers for contracts, or it might arise from the corruption or favoritism of such officer, and his consequent refusal to accept favorable offers when made. To prevent extravagance from the first source, the plan of public letting is adopted; the public are informed of contracts to be let, and its self-interest and rivalry are appealed to for proper offers upon them; to prevent extravagance from the latter source, all discretion is withheld from the contracting officer; he is bound to give the contract to the lowest bidder, and can not let it out for individual gain or as a reward to another. The method prescribed is well understood, clearly defined, and of distinctive character, specially adapting it to a conservation of public interests. It embodies three vital principles : an offering to the public, an opportunity for competition, and a basis for an exact comparison of bids; and any statutory

regulation of the matter which excludes or ignores either principle destroys the distinctive character of the system, and thwarts the purpose of its adoption.    Any arrangement which excludes competition prevents a letting to the lowest bidder."    Fones Hardware Co. v. Erb, 54 Ark. 645.

We are of opinion that the spirit and intent of section 11 of the act is that the Sanitary District shall so advertise the work to be let and invite proposals therefor, that nothing will be left to the discretion of the trustees, after the bids shall have been received, except to determine who is the lowest responsible bidder.    The question who is the lowest bidder is determinable by a mere inspection of the bids, and involves no exercise of discretion, but only a comparison of figures.    The bidder who has offered to do the work for the smallest sum is the lowest bidder, and as among bidders equally responsible, the work can not lawfully be awarded to one who is not the lowest bidder.

The Supreme Court has reprobated, in no uncertain terms, the reservation of the decision of any matter material to a public work until after the making of a special assessment for the work, or the reception of bids for the contract. Foss v. City of Chicago, 56 Ill. 354, was an appeal from a judgment for a special assessment.    The ordinance under which the assessment was levied provided that a certain street should " be curbed with curb walls, filled and paved with wooden blocks, *excepting such portions of the above described work which have already been done in a suitable manner*," thus reserving to the city authorities the determination of what part of the work had been done " in a suitable manner," instead of determining in the first instance the exact work to be done.    The court held that this reservation vitiated the assessment and said :

" It might be used as the instrument of favoritism in letting the contract for the work.    Some parties might be made to understand that the portions of the work already done were not done in a suitable manner, and that it would all have to be removed, while others might be informed that if they got the contract the portions already done would be considered as done in a suitable manner."

The case has been approved and followed in a number of subsequent cases.

In Ill. Cen. R. R. Co. v. Chicago, 144 Ill. 391, and Bradford v. City of Pontiac, 165 Ib. 612, a reservation of the right to make changes in the work ordered was held to be illegal, and that an assessment for the work ordered was, by reason of said reservation, invalid.

Littler v. Jayne et al., 124 Ill. 123, was a bill filed by a taxpayer, on behalf of himself and all other taxpayers of the State, to enjoin the State House Commissioners from making, signing or approving vouchers for any expense incurred under a contract for eight electro-bronze statues of public men of the State. One of the grounds for an injunction stated in the bill was that the contract was let without an advertisement for bids for the work as required by law. The statute in relation to the subject-matter required an advertisement for bids or proposals, and provided that the work should be let to the lowest responsible bidder. The court, after pointing out deficiencies in the advertisement and the specifications to which it referred, say :

" These were elements as to which there was necessity of information, in order for the making of any intelligent bid or proposal for doing the work. This is not only obvious, but the whole testimony in the case, that of experts as well, is that the advertisement, taken in connection with the plans and specifications and this elevation drawing, is wholly insufficient for the making of an intelligent bid for the construction of these statues in question; that in order to do that, verbal explanation, in addition, would be requisite. And it is insisted that that is sufficient, if the needed information might have been obtained through verbal explanations. To allow such resort to verbal explanations for information, at least to the extent that would be necessary in this case, would be inconsistent with the policy of the statute requiring public notice to be given of the letting of contracts for public work, and would tend to the admission of the mischief the statute was designed to remedy. The object of the statute is, that there should be notice, in writing, of the work to be contracted for, given by publication, to secure full and

fair competition and prevent favoritism. Verbal explanations might vary with different persons, and thereby bidders be made to stand not on the same equality, and there might, in this way, be afforded an opportunity for the exercise of favoritism."

It appeared in the case that the commissioners did not decide as to the kind of metal which should be used in the making of the statues until after the bids had been received, with respect to which the court say:

" How is it possible to regard the contract here as let in compliance with the statute requiring that all contracts for labor or materials shall be let after advertisement for bids for the same for thirty days, when the materials, the kind of which was of such vital consequence for the making of the contract in question, were not determined upon at the time of inserting the advertisement, and not until just before the opening of the bids and the letting of the contract? How could work and materials not known and determined upon, be advertised and intelligently bid for? The bid of Poulson & Eger was the only one made for the statues. The contract price, the proof shows, was some $2,800 or $3,000 more than the reasonable value. How could the kind of the material, the character of the work, who was to furnish the models, as described in the contract, have been ascertained and settled upon except through private negotiation."

The *ratio decidendi* plainly is, that all matters material to the contract to be let must be determined before advertising for bids, and that the advertisement, including documents to which it refers, must give full and definite information of the precise work to be done as a basis for intelligent bidding.

To the same effect are the following cases: Kneeland v. Furlong, 20 Wis. 460; Boren et al. v. Commissioners, 21 O. St. 311; People, etc., v. Board of Improvement, 43 N. Y. 227; Mazet v. City of Pittsburgh, 137 Penn. St. 548; Fones Hardware Co. v. Erb, 54 Ark. 645.

In Boren v. Commissioners the advertisement was for furnishing all the materials except the brick, and performing all the labor except excavating, in the erection of a court house, according to plans and specifications, etc.

Boren's bid conformed to the advertisement, and was $12,894.29 less than that of another bidder to whom the contract was awarded on the alleged ground that the bid of the latter included the brick and the excavation (bids for which were not invited), and that, in the judgment of the commissioners, the cost of the brick and the excavation exceeded the difference between the bids. But the court held the award illegal, saying:

" Whether this be so, can not be determined without resort to evidence outside of the written proposal, and then must rest in parol and be uncertain, which is contrary to the manifest purpose of the act under which the whole business must be conducted."

In People v. Board of Improvement, *supra*, the statute authorized the board to make an improvement according to such plan as it might adopt, and provided that the work should be let, on published notice, to the lowest bidder, who would furnish security to the satisfaction of the board. The published notice invited proposals for paving Union street with Belgian, improved Belgian, Nicolson, and other improved pavements, according to plans and specifications. The court say :

" What followed might reasonably have been expected, and perhaps was what was intended by the board. It was impossible for the board upon a canvass of these offers to determine therefrom which was the lowest. This could only be determined by considering which kind of pavement proposed for was the most desirable and durable and advantageous for use, and to what extent superior to the others, and then comparing these with the like qualities of the other kinds, in connection with the cost of each, and from this determining which offer was really the most advantageous as a whole for the public. The act contemplated the performance of no such duty by the board. It designed to open no such way for the exercise of favoritism. It designed that the work should be competed for as to price by contractors, and that this should be done in such a way that the lowest bidder could be determined by calculation, without any exercise of judgment as to the relative advantages of different kinds of pavement."

What the board did in the present case is precisely what

the court, in the case last cited, decided could not legally be done. The board decided, after all bids had been received, what design of bridge it would adopt, and based its award on considerations inadmissible at that stage of the proceedings.

In Fones Hardware Co. v. Erb, 54 Ark. 645, the advertisement was:

"Sealed proposals, competitive plans and specifications will be received up to noon, April 7, 1891, for the construction of a foot, highway and street railroad bridge, to be built by Pulaski county, Arkansas, over the Arkansas river," etc.

The court held the advertisement defective and insufficient, under the constitutional provision quoted *supra*, and say :

"There can be no intelligent bidding for a contract unless all the bidders may know what the contract is, and this can not be known unless the plan of the work to be contracted for, and the specifications according to which it is to be done, have been adopted; for they, with the price to be agreed upon, go to make up the contract." Ib. 651.

The court further say :

"When it is determined to build a bridge within a given time, and the location, plans and specifications have been adopted, all the terms of the contract are fixed, except the price to be paid; the obligation to build a bridge according to the terms thus fixed, is a thing to be offered to competition; and until it is formulated by the defining of those terms, so that they, in connection with the bid to be thereafter accepted, will comprise a complete contract, there is nothing to be let, and nothing to which competition can be directed. It is idle to talk of competition where the minds of bidders are not directed to the thing offered." Ib. 654.

In the present case the attention of bidders was invited by the advertisement to only two plans, one on the designs of C. L. Strobel, and the other on that of the Scherzer Rolling Lift Bridge Company. It appears from the record, and is conceded, that a bridge built on the plan of the latter design will be much more expensive than one built on the plan of the former, and that the designs are essentially dif-

ferent.   Therefore the adoption of the plan or design was
matter material to the contract, and it was incumbent on
the Sanitary District to adopt the plan or design before
advertising for bids, and the adoption of it after receiving
the bids, and the award based on such adoption, were
illegal.

Section 11 of the statute is stricter in its expressed require-
ments than was the statute commented on in any of the
cases cited.   It, in terms, requires public notice to be given
" of the terms and conditions upon which the contract is to
be let."   The phrase " terms and conditions " embraces all
of the contract.   How is it possible to give notice of the
terms and conditions upon which the contract is to be let,
when the very plan on which the work is to be done is
undetermined?   It is simply impossible.

Appellants' counsel rely mainly on Attorney-General v.
Detroit, 26 Mich. 263, in support of their contention that
the Sanitary District might lawfully reserve the selection of
a plan until after the bids were received.   In that case the
city advertised for proposals for paving a street with either
wood or stone pavement, according to specifications which
had been filed in the comptroller's office for each of several
kinds of wood and stone pavements.   Fifty-seven proposals
were received, only two of which were for the Ballard
patent pavement, and the contract was awarded to the bid-
der of the higher of the two bids.   The court in its opinion
held that the city might lawfully withhold its decision as
to which pavement it would adopt, until after receipt of the
bids; the court did not base its decision on that ground,
but on the ground that the pecuniary interest of the public
of the city of Detroit, represented by the attorney-general,
was less than thirty dollars, the minimum of equitable juris-
diction as prescribed by the Michigan statute, and there-
fore that a case for the exercise of equitable jurisdiction
was not presented.   Ib. 273-4.   The court expressly declined
to decide whether the council was justified in rejecting the
lowest bid.   In so far as the court held that the city might
reserve the decision of the kind of pavement it would adopt

until after the bids were in, we regard the opinion as not in harmony with the current of authority in this and other States.

The published notice, as in the case of Littler v. Jayne, *supra*, was not only calculated to deceive, but actually deceived bidders. It is evident from the affidavit of the seven trustees in support of the answer of the Sanitary District, five of which seven cast the majority vote in favor of the Scherzer Rolling Lift Bridge Company design, that the board intended from the first to adopt either that design or the Strobel design, and also that in soliciting bids for any other design which might be approved by the railroad companies, they merely intended to induce competition by the owners of such other designs, and thus perhaps induce lower bids by the owners of the Strobel and Scherzer designs.

Bids were invited "according to one or the other of two sets of plans furnished by the Sanitary District on the respective designs of C. L. Strobel and of the Scherzer Rolling Lift Bridge Company," etc., thus, as we think, plainly holding out to the public and to contractors, that the plans mentioned were equally acceptable to the district, and that a bid on either plan would be considered as in competition with any bid on the other. It is significant that this was the understanding of Mr. Randolph, the chief engineer of the Sanitary District, and who had been closely associated with the board of trustees during the entire consideration of the matter. His tabulated statement of bids, made in obedience to the order of the board, is thus headed:

"The bids in detail for erecting sub and superstructure of eight track railroad bridge across main channel of Section O, near Campbell Avenue, excluding operation of bridge."

"In order of magnitude. Lowest bid first. Opened June 25, 1898."

Under this heading the bids follow, commencing with the lowest bid, that of Strobel, $235,424.50, then following with the next higher, and in that order to the last, which is the highest.

From this it is apparent that Mr. Randolph's understand-

ing was, that the competition invited by the advertisement was a competition merely between amounts bid, and not competition as between designs.

As said in People v. Board of Improvement, *supra*, " what followed might reasonably have been expected, and perhaps was what was intended by the board." No two bids were of the same design with the partial exception that the King Bridge Company bid on the superstructure of the Scherzer Rolling Lift Bridge Company's design, but not on the substructure, whereas bids were invited on the sub and superstructure both, and not on each of them separately. There was not, therefore, in fact, any competition as between designs. It is difficult to understand the following clause of the advertisement, except on the hypothesis stated in substance in the affidavit of the seven trustees, that they never intended to adopt any design except that of Strobel or the Scherzer Rolling Lift Bridge Company:

" Tenders will also be received upon any other design which may be submitted in competition with the two before-mentioned designs, provided such tenders are accompanied by written approval and acceptance from each of the three railroad companies interested in this structure; and further provided, that in its design, workmanship, strength and quality of material it conforms to the requirements of the Sanitary District of Chicago."

There is no requirement of the Sanitary District as to a design referred to in the advertisement, except that the work must be in accordance with one or other of two sets of plans on designs essentially different, and it does not appear, and certainly is not probable, that a bridge constructed on a design different from the designs mentioned in the advertisement, namely, the Strobel and Scherzer Company designs, could be constructed on a set of plans prepared for and adapted to either of said two designs. No plans being referred to except the plans of the Strobel and Scherzer designs, to which bidders could have access, it necessarily follows that bids on other designs were limited to the owners of the designs, thus resulting in inequality between bidders. Also, the trustees not knowing what other designs might be bid on, could not and did not pub-

lish the terms and conditions on which a contract for any of such other designs would be let.

Appellants' counsel say that no fraud is charged in the bill. This is not necessary to appellee's case. It is not even necessary to appear that there was actual or intentional fraud. It is enough if it appears that, by a violation of the statute, an opportunity for fraud or favoritism was created.

In Foss v. Chicago, *supra*, the court, referring to the reservation of the right to decide what portion of the work ordered had been done in a suitable manner, say : "It might be used, and it does not affect the principle whether it was so used or not, as a cover to an unfair estimate of assessment," and again, "it might be used as the instrument of favoritism in letting contracts for the work."

The order will be affirmed.


Mr. Presiding Justice Windes.

I concur in affirming the order of injunction, but am of opinion that while it is a proper subject for decision, it is not necessary to the decision of this case to decide, as is done by Mr. Justice Adams in his opinion, that it was the duty of the Sanitary District trustees to decide, in advance of an advertisement for bids, that they would build a bridge according to one particular design and advertise for bids on that design alone. As to whether this was the duty of the trustees I am in doubt, and do not therefore assent to that part, though I concur fully in the remainder of the opinion.

Had the advertisement made it clear that the trustees sought bids upon each of the Strobel, Scherzer and other designs, clearly and specifically described, so that all bidders could tell what design and all the designs there were open to competition, and which were accompanied by plans and specifications applicable to each of such designs, and also made clear that designs as well as bids were in competition, then I am inclined to the view that there would have been much fuller and fairer competition than was given by the advertisement in this case. The notice given, so far as it refers to other designs of bridge than the Strobel and

Scherzer designs, did not, in my opinion, comply with the law which requires that notice be given of the terms and conditions upon which the contract is to be let.

It can not be a compliance with the law as to terms and conditions upon which the contract will be let when the notice leaves it uncertain and unknown to all bidders as the one at bar does, as to what designs, outside of the two named, are competing, and what would be the plans and specifications with reference to which the contract would be let, in case any other than the Strobel or Scherzer design should be selected by the trustees.

To have a full and fair competition as to designs, as well as bids, it is highly important that all persons desiring to bid should know each of the designs in competition and the plans and specifications that accompany each design, so that if a bidder wishes to bid on each design he may know the terms and conditions of the contract, if a particular design should be selected, and also when the bids on that design are opened, it may be known by a mere comparison of figures whether he is or is not the lowest bidder.

Mr. Justice Sears dissenting.

The court is unanimous in the conclusion that the appellant had power to enter into a contract to erect a bridge by way of compensation to the railroads in question.

The only other question raised, and the only question upon which there is difference of opinion in the court, is as to whether the provisions of section 11 of the act under which appellant is organized, have been complied with in the letting of the contract here involved.

No charge of fraud or favoritism is made by the bill of complaint; but it is urged that the letting of the contract was illegal under the provisions of section 11, in that there was not proper competition allowed and opportunity for favoritism was afforded.

There is very general agreement of all authorities in interpreting the purpose of such provisions as those of section 11, to the effect that it is to obtain for the public the

benefit of open competition, and to preclude favoritism in awarding contracts.    The competition which it is sought to insure can not be other than full opportunity extended to every one to make offers upon complete plans and specifications of the work which is finally contracted for.    The favoritism which it is sought to exclude would necessarily be any favoritism in choosing between those who have thus had opportunity to make and who have made offers upon such plans and specifications.    It is not contended that this doctrine would operate to limit the exercise of the discretion of the board in choice of design or plan, even though the exercise of such choice might present possibility of favoritism.    If the board had, before advertising for bids, accepted a design as the best and most suitable, even though its adoption limited the scope of competition to one or two persons who were capable of complying with its terms, yet, in the absence of fraud, such choice would not be held illegal on the ground that it offered opportunity for favoritism.    In re Dugro, 50 N. Y. 513.

The contention of appellee is, however, that though such choice of design is within the control of the board before the advertising for bids, yet it can not be within their control after the taking of bids.    If this is so, it can not be because of any possibility of favoritism in choice of design, but must be solely because it operates to limit the competition required.    In the case here the contract was let to the Scherzer Bridge Company, and the design chosen was that known as the Scherzer design.

There was absolutely free competition afforded to bidders upon this design.    With the advertised invitation to bid, complete plans and specifications were submitted, in accordance with which the contract was finally let.    Every one who read the advertisement knew that the Scherzer design might be accepted, and every one had opportunity to bid upon the plans and specifications of that design.

Counsel for appellee, in his argument and citation of authorities, confuses two distinct and very different propositions, viz.: first, the necessity of furnishing definite plans

and specifications of the design which, after submission to bidders, is made the basis of a contract; and, second, the necessity of submitting one design only to bidders, rather than to submit several designs, each accompanied with definite plans and specifications. Upon the first proposition all the authorities cited bear, and they are in substantial accord. Upon the second proposition no authority is cited by appellee.

Some cases are cited as holding that the choice among a number of designs considered must be made before the taking of bids. Upon examination, however, no one of them will be found to have presented that precise question. They do hold that definite plans and specifications must be adopted and submitted to the bidders, and that this is essential to full and fair competition. In the case here, such plans and specifications were adopted. In Littler v. Jayne, 124 Ill. 123, the substance of the decision is that no sufficient specifications were presented to bidders to permit of intelligent bidding. No question of choice of designs arose in that case.

In People v. Board, etc., 43 N. Y. 227, it would appear that no plans or specifications of the work finally let, viz., the construction of the Ream pavement, were ever approved by the board and submitted to the competition of bidders. The court said: "The board must first adopt plans and specifications of the work required to be done, so that those desiring to contract therefor can understandingly make offers for its performance. In this way only can competition be secured to the public."

To the same effect are: Kneeland v. Furlong, 20 Wis. 460; Boren v. Commissioners, 21 Ohio St. 311; Mazet v. City, 137 Pa. St. 548; Fones Hardware Co. v. Erb, 54 Ark. 645.

In the Wisconsin case, the court thus indicated the question presented:

"Bidders should be informed, either by the notice of the letting or by the specifications, etc., * * * of the terms of the contract; at least of the quantity or amount of work,

Sanitary District of Chicago v. Lee.

whenever it can be specified, to be included in any one contract; the time within which it is to be finished; the manner in which it is to be done; and, if materials are to be furnished, their quality. All this we think the charter requires. Did the notice in this case give such information?"

In the Ohio case the gist of the decision is expressed in these words: "For the commissioners had no power to make a contract embracing work and materials not called for in the notice and specifications on which the proposals were made." The reasoning is obvious, for on that part of the bid not covered by the invitation to bid and the specifications, there could have been no competition.

In the Pennsylvania case the decision turns upon the same question—the necessity of definite plans and specifications of the work which is let by the contract.

In the Arkansas case the same question as to necessity of plans and specifications is passed upon, and the court said:

"If different plans and specifications were adopted, and bids invited at the same time for contracts according to each, whether the board could compare the bids upon the different plans submitted and accept the lowest bid upon the plan then selected, is a question not raised or considered."

A like statement might consistently have been added to the opinion in each of the other of the foregoing cases, excepting, perhaps, in the New York case. I regard any doubt which might arise from the language of the court in that case as settled by a later decision of the same court, which is hereinafter cited. Other authorities relied upon by appellee are decisions in special assessment cases, which apply by analogy only, and go only to the question of necessity of definite plans and specifications. Upon this proposition substantially all authorities agree. No one of these cases referred to holds that if there be free and open opportunity to bid upon the design ultimately accepted, and if the plans and specifications of such design are submitted to the bidders, the choice of the design might not be as well made after as before the taking of bids. Nor am

I able to find any authority to the effect that, under such circumstances, the particular one of several designs contemplated must be selected by the board before submitting the several designs, with plans and specifications thereof, to bids. There is, however, very respectable authority to the contrary. 1 Dillon on Municipal Corporations, Sec. 468; Attorney-General v. Detroit, 26 Mich. 262; City v. Hosmer, 79 Mich. 384; State v. Birkhauser, 37 Neb. 521; Gilmore v. City of Utica, 131 N. Y. 26.

The rule, as announced by Judge Dillon, is:

" As the purpose of such a provision in the charter is to secure, through competition, the most advantageous terms, something is necessarily left to the discretion, to be fairly exercised, of course, of the council, in the adoption of the course which will best attain the end; and it does not contravene this restriction to call for bids for putting down various kinds of wood and stone pavements, some patented and some not, and afterward, when all the proposals are in, selecting the one which is relatively the lowest or the most satisfactory, all things considered; but when the kind is thus selected, the lowest responsible bidder who has the lawful power to perform his undertaking, has the absolute legal right to have the contract awarded to him."

In the Michigan case, Mr. Justice Cooley said:

" The first question involved in the merits of the suit is, whether the council were justified in proceeding in the manner mentioned to obtain proposals. It is insisted, on behalf of the attorney-general, that the kind of pavement to be put down should be first determined, and that bids should be called for and competition invited for that kind alone. It is denied that wood pavement can be put in competition with stone pavement, or that two kinds of wood pavement, essentially different in construction and cost, can be included in the same notice which calls only for proposals for the paving of one street. * * * I do not doubt that it was competent for the council, in this case, to have confined the bids to what is called the Ballard pavement. But if this had been done, it must be obvious that the best method would not have been adopted to invite competition, or to obtain cheap pavements. Assuming that pavement to be protected by a valid patent, the assignees of the right were in position to fix their own terms in a contract, or for the permission to lay it. But if another kind was of nearly

Sanitary District of Chicago v. Lee.

equal value, competition might perhaps be had by putting the one against the other, and inviting bids for both. The greater the number of such pavements, the larger is the opening for competition. It is quite true that if, when the bids are in, the council may reject one kind on the ground of its being less valuable than another, it must follow that the bids are not conclusive upon the right to a contract; but that the right in a council to determine the kind is more likely to be exercised from dishonest motives after the bids are in than it would be in deciding what bids should be received, is not, to my mind, very apparent. On the contrary, the broader the door that is opened to competition, the greater will be the number of those who will be interested in watching the proceedings to see that just awards are made and impartial judgments pronounced. If there is danger of corrupt understandings and combinations when there are a score of bidders, the danger is proportionately increased when the door is closed against all but one or two. And where, as in this case, the owners of the patented processes are not only invited to bid against each other, but are also put in competition with all who may offer to lay the kinds not patented, it is obvious that the council in their invitation for bids have done all that the nature of the case admitted of being done to secure competition for the public benefit. The proposals have had the spirit of the law in view, and, I think, are within the letter also. * * * It would be the duty of the council, when all bids were in, to examine all, and to select the kind of pavement for which the bids, all things considered, were relatively the lowest. They might thus, perhaps, reject the kind they would have preferred in advance, but for which they find all bids exorbitant, and determine upon another, because, in their opinion, the offers made for it are more satisfactory. But when the kind is selected, they have no discretion to be exercised in a choice between responsible bidders. The lowest has an absolute right to the contract."

In the Nebraska case the court said:

"The advertisement or notice to contractors may, and in this case did, call for bids on the various kinds of materials liable to be used, and in that event contractors could bid as intelligently as if bids were asked for on vitrified brick alone, or on any other material. * * * The method adopted in this case is more likely to prevent combination between contractors than if bids were asked upon any one kind of material," etc.

And:

"We are constrained to hold that bids for paving may properly be advertised for and received, either before or after the selection of material," etc.

In the Gilmore case, which was a special assessment case, the New York Court of Appeals said:

"The plaintiff finds fault again upon the ground that there never were any accurate plans and specifications filed, because those which were filed provided in the alternative for the repavement of thirty-six feet in width, with street railroad tracks, outside the curbs, and between the curbs and sidewalks, or for the repavement, fifty-two feet wide, with a single or double street railroad track in the center of the street. We think there is no weight in this objection. If there were plans, etc., in the alternative, we see no ground for a charge of illegality therein. If the work would be more costly in proportion to the work done, if prosecuted with reference to one plan than the other, the offer or proposal could be in the alternative. * * * Here, again, is an entire absence of proof that an injury has been caused a human being by reason of this kind of alternative plan. There is no evidence that any one was misled or prevented from bidding or that the cost of the work actually done was enhanced a penny by reason of this kind of plan. It is of the purest technicality, and under these circumstances courts should not be astute to find means of setting aside what, so far as the evidence shows, is a meritorious assessment, levied for the payment of the cost of a public improvement."

These decisions are based upon good reasoning. No one could contend that the board might not, in its discretion, determine which of the several bridge designs was best adapted to the requirements, and hence which one should be the one to be used and the only one to be submitted to bids. The board had a very distinct interest in the operation of this bridge, aside from its acceptance by the railroads, for the terms of its contract with the railroads imposed upon it a burden as to the maintenance, operation, etc., of the bridge. Nor is there any reason why this determination should be made before rather than after the getting of bids. There is every reason for a contrary rule. For it might be that while one system of bridge was in fact better and more desirable than any of the others, yet it might not be so much better as to warrant the paying of an

exorbitant difference in price.   To submit plans of the one only to bidders, might and probably would result in limited competition and excessive bids.   To submit other plans at the same time would naturally conduce to a wider competition and lower bids.

If all were invited to bid upon the Scherzer plans and specifications, the competition contemplated by the law was accomplished, and favoritism as between bidders upon such plans and specifications was precluded.   The essentials laid down by all the authorities had then been fully complied with, viz., complete and definite plans and specifications furnished of the work contracted for, and à submission of the contract with such plans and specifications to the competitive bidding of all persons.

If we accept as sound the doctrine announced by Judge Dillon in his treatise and by Judge Cooley in his opinion, to the effect that the submission of the Strobel design, accompanied by plans and specifications, in no wise imposed any illegal limitation upon the competition on the Scherzer design, then it follows of necessity that the taking of bids upon any number of designs, whether accompanied by plans and specifications or not, no one of which was accepted, could not affect the legality of the competition upon the Scherzer design.

I dissent from the announcement of a rule which does not seem to be in accord with the only authorities upon the precise question presented.