## City of Chicago v. John McKechney et al., Surviving Partners of Weir, McKechney & Co.

1. CITIES AND VILLAGES—*Contracting Where the Charter is Silent as to the Mode.*—Where the charter of a municipality is silent as to the mode in which a city council shall perform an act, the decision of the council may be evidenced by either a resolution or an ordinance.

2. SAME—*Power to Contract Without Advertising for Bids.*—Where the law under which a city is organized provides that a contract may be entered into by the proper officer without advertising for bids by a vote of two-thirds of all the aldermen or trustees elected, and it is not necessary that the vote shall be in the form of an ordinance, it may be by a yea and nay vote.

3. SAME—*Compensation for Extra Material and Work in Contracts for Public Improvements.*—Where, in carrying out a contract for public improvements, extra work and material of a different character from those specified in the original contract are furnished, the rates named in such contract will not apply and the party furnishing such extra work and material will be entitled to recover for the same according to the value as fixed by the evidence.

4. ESTOPPEL—*Of a City by an Agreement Between a Contractor and an Officer.*—Where an agreement between a contractor and an authorized officer of a municipality for extra work and material rendered necessary by alterations in an original contract, is made in good faith and gives a reasonable compensation, fair alike to both parties, it will estop them from afterward questioning it.

5. RATIFICATION—*Of the Acts of Municipal Officers.*—Where a contract is entered into by an officer of a city on behalf of the city, and is one which the city is authorized to make, it may be ratified, and such ratification may be inferred from acquiescence after notice.

6. SAME—*Of Contracts Ultra Vires.*—Where a public work which a city has the power to do in a proper way is done in an improper way, but is accepted and enjoyed by the municipality, it will be bound to pay for it the same as if it had been done in a manner not *ultra vires*.

7. CONTRACTS—*By Municipal Corporations—Conditions for Extra Work.*—Where a contract was let to the lowest bidder, in due form, by a municipal corporation containing a provision authorizing the commissioner of public works to make alterations which might increase or

City of Chicago v. McKechney.

diminish the expense and to determine the value of the work so added or omitted, *it was held*, that where such alterations did not involve any material departure from the original plans and specifications so as to constitute a new and different undertaking, they did not annul the original contract, and it was the duty of the commissioner to determine the value, and if that was impracticable, to let a new contract by reason of the conditions, and the fact that the extra payments aggregated a large amount, did not necessarily make such determination a new contract for new work, under the statute.

Assumpsit, for work, labor, etc.   Appeal from the Circuit Court of Cook County; the Hon. ELBRIDGE HANECY, Judge, presiding.   Heard in the Branch Appellate Court at the October term, 1899.   Affirmed.   Opinion filed October 23, 1900.   Mr. Justice HORTON not concurring.

Statement by the Court.—This is a suit to recover for work done in the construction of section three of what is called the North West Land Tunnel for the purpose of conducting water to the northwest quarter of the city of Chicago.

In August, 1895, the city by its commissioner of public works advertised for bids, and appellees being the lowest bidders, a contract in writing was executed October 19, 1895, between the parties to this controversy for the construction of said section 3, in accordance with the provisions of said contract and the specifications attached thereto and made a part thereof.   No question is made as to the validity of that contract.   On the contrary it is stated by counsel for appellant that it is "not attacked in this proceeding and will be presumed to have been in pursuance of law." Controversy has heretofore arisen, with regard to certain of its provisions, and this controversy has been considered in Weir v. City of Chicago, 67 Ill. App. 247, and City of Chicago v. Weir, 165 Ill. 582.   That contract provided that the contractors should receive for " tunnel in earth, eight feet internal diameter, $16.65 per lineal foot; tunnel in rock, eight feet internal diameter, $15.90 per lineal foot; rock excavation over and above cost of lineal foot of tunnel or shaft, $2 per cubic yard."   It also provided :

" When the tunnel is partly in earth and partly in rock the contractor will be paid an additional price per cubic

yard for rock excavation over and above the unit price per lineal foot of tunnel in earth."

In the specifications it is provided that " no extra allowance will be made for quicksand, hardpan or boulders," and also that " in every instance all spaces left between the outside of the regular brick work and the excavation shall be filled in with solid brick masonry, but no allowance will be made for such additional work and material." The commissioner of public works is allowed by the contract to reserve the right to make such changes in the plans and specifications as he may deem desirable or necessary or as the emergency demands, and the contractor is required to furnish additional material or do additional work as so required for "prices for like work stipulated in the contract." There is also a section providing further:

" Should the commissioner of public works deem it proper and necessary in the execution of the work to make any alterations which shall increase or diminish the expense, such alterations shall not annul the agreement, but the commissioner shall determine the value of the work so added to or omitted, such value to be added to or deducted from the contract price as the case may be."

After the final decision in the case above referred to, the contractors resumed work, which had been in large part suspended pending the litigation, and encountered material of a character which it is claimed is not provided for under the original contract, called by the contractors " conglomerate " and by appellees " boulder clay " and " hardpan." Thereupon an agreement was made with the commissioner of public works, whereby the latter agreed that there should be an additional six dollars a cubic yard allowed the contractors for the work done in such material. Before any action was taken there was a change of administration, and a new commissioner of public works was appointed. Finally a new supplemental agreement in writing was made embodying the arrangement so agreed upon. It was signed by the contractors and handed to the new commissioner of public works to be executed, it is alleged, by the mayor and comptroller of the city. The commissioner

denies that he agreed to have it so executed, and the document was never in fact signed by them, but it was nevertheless acted upon by both parties and treated by the department of public works of the city as a contract between the parties.

The agreement is dated May 17, 1897, and recites the making of the original contract of October 19, 1895; that said contract prohibited the use of explosives; that " the material required to be excavated in part of said section has unexpectedly been found to be neither ordinary earth nor solid rock, but a material exceedingly hard in its nature, requiring practically as much use of explosives as rock;" that delays have been caused by differences of opinion as to construction of the contract of October 19, 1895, and that it will be practically impossible to complete said work within the time provided in said contract. It then provides that explosives may be used under certain restrictions, and contains the following :

" Third. From and after the 15th day of March, 1897, the said Weir, McKechney & Co. shall be allowed in estimating for work done on said tunnel, as provided for in the contract of October 19, 1895; all material encountered in earth tunnel that is rock or of such a nature that it is classified as rock, shall be paid for at the rate of six dollars per cubic yard, in addition to the lineal foot price. The specifications and the contract for October 19, 1895, covering this allowance, are as follows :

' When the tunnel is partly in earth and partly in rock, the contractor will be paid an additional price per cubic yard for rock excavation over and above the unit price per lineal foot of tunnel in earth.'

Fourth. It is further agreed that the time for the completion of said tunnel as provided for in the contract of October 19, 1895, viz., October 1, 1897, shall be and the same is hereby extended nine months from the last mentioned date, to wit, to July 1, 1898.

Fifth. In earth tunnel, or in tunnel which is excavated partly in earth and partly in rock, where extra masonry is directed to be placed between the upper quarters, outside the regular specified rings of brickwork of the tunnel and the crown bars or planks to protect the work, the same shall be allowed and estimated at the price of ten dollars per cubic yard."

The work proceeded after the formulation of this alleged agreement of May 17, 1897, until on or about April 21, 1898, when, owing apparently to a series of differences between the city's engineer or other representatives and the contractors as to the validity of the contract of May 17th, and other matters, the contractors contending they were not receiving the money due them as the work progressed, stopped work entirely. Matters remained in this situation until in July following, when work on the tunnel was resumed as the result of proceedings by the city council. That body, in view of the controversies which had brought about a suspension of the work, referred the matter to the finance committee. As a result of conferences held, the appellees herein submitted to the mayor a proposition as a basis of adjustment. This communication was submitted by the mayor to John P. Wilson, Esq., as special counsel for the city, who reported in part as follows :

" I may add that the largest item of alleged over-payment on the part of the city, namely, $89,431.20, for the excavation of rock in the earth section of the tunnel, at $6 per cubic yard, has been paid under agreement entered into between the said contractors and the city, under the advice and written opinion of its corporation counsel; that in my opinion it is clear that the contractors are entitled to compensation at some rate per cubic yard for the rock so excavated, and that it is not unreasonable that the contractors should insist that the city should abide by the price so agreed upon, under the advice of its corporation counsel, until it should be determined by the courts' that some other price is the price that should be paid therefor."

The finance committee of the council reported July 11, 1898, after full conferences with the city engineer, corporation counsel and the contractors. In that report it was stated that delays had been caused by differences of opinion between city officials and the contractors as to their respective rights; that after the execution of the original contract of October 19, 1895, the city authorities made certain changes in the location and terminal points of sections two and three of the tunnel, which had given rise to much difficulty; that complicated litigation involving questions

of law and fact was pending, and that it was important that some arrangement should be made by which the work should be pushed to completion, without waiting for termination of such litigation. The committee therefore recommended an arrangement with the contractors for section three of the tunnel, pending the termination of the law suits, the case before us being one of those suits, upon the following basis:

"First: Commissioner of public works to issue an estimate to Weir, McKechney & Co., for the work done and material furnished for said tunnel during the month of April, 1898, amounting to about $30,000, and that the comptroller pay the same.

Second: That the comptroller pay Weir, McKechney & Co. fifty per cent of the amount now held by the city under the fifteen per cent reservation clause in their contract.

Third: That the city pay Weir, McKechney & Co. $2,806.38 on account of expenses incurred in pumping water from the different shafts, to maintain the work in condition, from April 21, 1898, to May 23, 1898.

Fourth: That the city pay Weir, McKechney & Co. the amount necessary to pump the water from the various shafts to prepare for the resumption of work.

Fifth: That the commissioner of public works issue estimates in regular form twice each month for work which may hereafter be done, the city paying on such estimates only the cost of the expense of the work, and in no event paying more than the amount called for by such estimates.

Sixth: That the pleadings in the pending suits between said contractors and the city be so changed as to cover and settle all controversies and matters at issue between the city and said contractors up to the time of the trial of said suit; and that said suit be advanced to a hearing at the earliest possible day, and that upon the hearing of said suits all questions in controversy shall be open for determination and decision without prejudice to either party by the making of the arrangement under which work is resumed, and the making of any payment thereunder, so that the final judgment or decree may be in accordance with the right of the parties, upon the merits, as determined by the court, independent of such arrangement for the resumption of the work. In the final adjustment the city to receive credit for all moneys paid to said contractors on any account in connection with the construction of said section 3, and judgment to be rendered, if at all, against the city for the

balance due, and in the event that an over-payment shall be found to have been made, the city to be entitled to recover the amount of such payment."

The report submitted therewith the said proposition of the contractor to the mayor, "and the report of John P. Wilson, special counsel thereon, upon which, in part, the foregoing report is based." Thereupon at its meeting of July 11, 1898, the city council by an aye and nay vote unanimously concurred in this report of its finance committee, and adopted the following resolution:

"*Resolved,* That the commissioner of public works be authorized, in making estimates for work done by Weir, McKechney & Co., on Section 3 of the Northwest Land Tunnel, pending the settlement of the questions at issue between said contractors and the city, to allow said contractors, in addition to the lineal foot price, where the tunnel is in earth, $6 per cubic yard for rock, and for all material which shall be classified as rock, and where the tunnel is in earth, or partly in earth and partly in rock, to allow said contractors $10 per cubic yard for all extra masonry directed to be placed between the upper quarters, outside of the regular specified rings of brickwork of the tunnel and the crown bars or plank to protect the work; the making of said estimate in said manner, and payments made thereon to be without prejudice to the rights of the city, and in no wise to affect the determination of the questions at issue between the city and said contractors."

This proposition of adjustment was accepted by Weir, McKechney & Co. Thereupon they resumed the work upon the tunnel and continued the same in accordance with this agreement, until November 11, 1898. In the meantime, October 8, 1898, the terms of the arrangement of July 11, 1898, were at the instance of the city put into the form of a written agreement and duly executed by the parties for the purpose, as it is stated, of evidencing the said arrangement by written agreement. It is executed by the contractors and by the city of Chicago, by its commissioner of public works, countersigned by its comptroller, and approved by its mayor, and the said parties have thereunto set their hands and seals. In substance this written agreement is the same as the stipulations embodied in the set-

tlement of July 11, 1898, by the mayor and city council. There is evidence tending to show that pending the negotiations resulting in the report of the finance committee of July 11th and the written agreement of October 8, 1898, the city engineer expressed to said committee the opinion that to forfeit the contract and relet the work would cost the city more than to allow the contractors to complete it.

It is claimed that the contractors proceeded negligently and disobeyed the proper directions of the city engineer and commissioner of public works on the one hand, and on the other, that notwithstanding the arrangement of July 11th embodied in the agreement of October 8th, the city officials refused to make semi-monthly estimates and to make the agreed payments; that for the month of October the expense of the work was $42,728.29, but that the city's estimate was only $12,754.46, of which only eighty-five per cent was paid. This was in pursuance of the claim made by certain of the city officials that the extra payments for rock excavation in the conglomerate and for back masonry were illegal, notwithstanding the supplemental agreement of May 17, 1897, and the arrangement by the city council of July 11th, and the contract of October 8, 1898, which it is now claimed " were in law frauds upon, and evasions of, the city charter." This was, as the appellant's counsel admits, " but the renewal of former disputes which were carried on almost all the time during the work of these contractors."

It was thus brought about that the arrangements made July 11th for completion of the tunnel were nullified, and November 11, 1898, the contractors suspended all work upon the tunnel. They also procured an injunction restraining the city from forfeiting the agreements and taking possession of the tunnel. This injunction was dissolved in June, 1899, and June 23, 1899, the commissioner of public works served upon the appellees a notice of forfeiture, containing the following :

" Take notice that, whereas, your firm has repeatedly violated the provisions of that certain agreement entered

into between said firm and the city of Chicago, on the nineteenth day of October, 1895, for the construction by said firm of section three of the northwest land tunnel, and that you are now continuing to violate the same; that as a part of such violation, you have failed to proceed, and are now refusing to proceed, with the work of constructing said tunnel, in accordance with the requirements of said agreement; that the rate of progress heretofore made, and being now made, by said firm in the construction of said tunnel was not, and is not, in my judgment, as rapid as it should be, nor according to the requirements of said agreement.

That, whereas, in a portion of said tunnel the material is earth or clay, yet you have been, and were up to the 11th day of November, 1898, still excavating therein more than could be lined with masonry the same day, which is contrary to the provisions of said contract; that whereas, the agreement provides that the excavation for the tunnel, when through firm clay, shall conform exactly to the outside of the masonry; and, whereas, a portion of the excavation of the tunnel, being constructed previous to November 11, 1898, was in such material, yet, that nevertheless, you have not made such excavations conform to the outside of the said masonry, as required by said agreement.

That in doing the work of constructing said tunnel you have been making excavations therefor a great deal larger than necessary, which is liable to cause injury to said tunnel when completed; that the methods of construction heretofore pursued by said firm have been extravagant, reckless and dangerous, thus greatly, unjustly and wrongfully increasing the cost of the tunnel to the city of Chicago, the practice of your firm having been to make unnecessary excavations, which have been and are required to be filled with expensive masonry and timbering, and which has been done by your firm against the protest and objections of the engineer in charge of the work, and of the city engineer.

And whereas, said firm did, on or about the 11th day of November, 1898, in violation of said contract, abandon the construction of said section three of said tunnel, and allowed portions of the same to remain in a very dangerous condition, thereby causing the city of Chicago very great expense and annoyance, and you have also refused to protect the unfinished portions of said tunnel, so that great injury has been thereby caused to it, and also to the buildings of citizens of Chicago, upon the surface of the earth over said tunnel; and that you have unnecessarily, maliciously and wrongfully, and in violation of said contract, delayed the con-

struction of said tunnel, greatly beyond the time provided for its completion.

And whereas, your firm have also violated and are violating the said agreement in other respects; therefore I, as commissioner of public works of the city of Chicago, do hereby, and from the delivery of this notice to you, declare the said agreement forfeited as to the whole of said work provided to be done by the terms of said agreement, and yet unfinished, and you are ordered and directed to at once discontinue all work upon said tunnel, and to at once remove all your property therefrom."

At the time of the service of this notice, June 23d, the trial of the case before us had just begun in the Circuit Court. Fifteen days thereafter, July 8, 1899, while the trial was still in progress, the plant of the appellees in the tunnel was seized by the city. Evidence was introduced, tending to show the value of the plant thus appropriated to be $63,086.21.

The jury returned a verdict, July 15, 1899, in favor of appellees for $619,638.81. A motion for a new trial was denied, the plaintiffs having filed a remittitur of $64,078.59 at the suggestion of the trial court, and judgment was entered August 29, 1899, for $555,560.22.

The plaintiffs meanwhile had filed a stipulation of waiver, stating that the parties, at the time of making said contract, agreed as a part thereof that all moneys by said contract provided to be paid to plaintiffs were payable out of the water fund of the defendant, derived and to be derived from sales of water by defendant from the water system and water works, and extensions thereof belonging to the defendant; that such agreement as to the fund from which payment was to be made was not expressed in that contract; that the tunnel to be constructed by plaintiff according to the terms of said contract was an extension of the water system of the defendant; and plaintiff waives right to payment out of any and all moneys raised by taxation and out of all funds and moneys of defendant, other than said water fund. This is in accordance with an averment in the fourth additional count of plaintiff's declaration, and

conforms to the practice in the case of City of Chicago v. Duffy, 179 Ill. 447.

CHARLES M. WALKER, corporation counsel, THOMAS J. SUTHERLAND and JAMES E. MUNROE, attorneys for appellant.

L. D. CONDEE and PECK, MILLER & STARR, attorneys for appellees.

MR. JUSTICE FREEMAN delivered the opinion of the court.

It is the principal contention of counsel for the appellant that the supplemental contracts of May 17, 1897, and October 8, 1898, are invalid because they were made without any new advertisement for bids and reletting the work to the lowest bidder in accordance with the provisions of Section 30, Art. IX of Chap. 24, R. S., being the act to provide for incorporation of cities and villages.

As to the validity of the original contract of October 19, 1895, under which the work began, no question arises in this case. The decision, moreover, in City of Chicago v. Duffy, 179 Ill. 447, sustaining a judgment upon a similar contract for the construction of section 2 of the same water tunnel, would seem to justify the conclusion that it is a binding obligation. Some of its provisions have been construed, as before stated, in City of Chicago v. Weir, 165 Ill. 582.

The section of the statute referred to, which it is insisted was not complied with before making the supplemental agreement of May 17, 1897, and the contract of October 8, 1898, is as follows:

"All contracts for the making of any public improvement to be paid for in whole or in part by a special assessment, and any work or other public improvements, when the expense thereof shall exceed $500, shall be let to the lowest responsible bidder in the manner to be prescribed by ordinance, such contracts to be approved by the mayor or president of the board of trustees: Provided, however, any such contract may be entered into by the proper officer without advertising for bids, and without such approval, by a vote of two-thirds of all the aldermen or trustees elected."

The last of the two agreements in question, that of October 8, 1898, was made pursuant to a report of the finance committee, and a resolution adopted by a unanimous yea and nay vote of the city council. This resolution and report apparently received more than the necessary two-thirds vote of all the aldermen elected, and so far as that contract of October 8th is in accordance therewith, it complies with the requirements of the statute in question. The contract recites that it is executed because "the parties are desirous of evidencing" the arrangement embodied in the report and resolution adopted by the council July 11th;" and states that the said parties "entered into a contract with the city of Chicago, dated October 19, 1895, and a contract supplemental thereto, dated May 17, 1897." This last recital is embodied also in the report of the finance committee of the council, but the supplemental contract of May 17th gains only such additional support therefrom as arises from its formal recognition in said agreement and report by the city officials and by the council. The city council and the mayor do thereby undoubtedly concede the existence of the supplemental contract of May 17th as a subsisting agreement, but not necessarily that it is valid. The arrangement evidenced by the said agreement of October 8th is by its terms confessedly a temporary expedient, a *modus vivendi*, to allow the work to go on, and authorizing the proper officers of the city to make estimates and payments in accordance with the terms of the supplemental contract of May 17, 1897, pending the settlement in the courts of the controversy over its validity and without prejudice to the rights of the city in such controversy.

There are, however, in the report adopted by the city council, certain additional recommendations not embodied in the agreement of October 8th; first, authorizing payment by the city of $30,000 for April; second, payment of fifty per cent of amount withheld by the city under a fifteen per cent reservation in the original contract; third, that the city pay the expense of pumping accumulated water from the tunnel. It is urged by the city's attorneys that the council had no power to so provide, and no power to

authorize payment as provided in the resolution of July 11th; that all such proceedings were void. The proviso in section 50 of Art. IX above referred to, is, however, that any contract for work or other public improvement may be entered into without advertising for bids and without the approval of the mayor "by a vote of two-thirds of all the aldermen" elected. It is not required that this vote shall be in the form of an ordinance. As a proposition creating liability against the city it required a yea and nay vote, which was had. In C. & N. P. R. R. Co. v. City of Chicago, 174 Ill. 439, 445, it is said that "where the charter of a municipality is silent as to the mode in which the city council shall perform an act, the decision of the council may be evidenced by either a resolution or an ordinance." The provision of the charter under consideration merely prescribes "a vote of two-thirds of all the aldermen," and this requirement was complied with. We regard the objection to the admission in evidence of the council proceedings of July 11th, and the contract of October 8, 1898, as not well taken. The payments authorized by the adoption of the report and resolutions were legally ordered.

The principal controversy before us is with reference to the validity of the supplemental contract of May 17, 1897. That contract provides an extra allowance for the contractors from and after March 15, 1897, as follows: First, "all material encountered in earth tunnel that is rock or of such a nature that it is classified as rock, shall be paid for at the rate of six dollars per cubic yard in addition to the lineal foot price;" second, payment of ten dollars per cubic yard for extra masonry in the excavation outside of the regular brickwork, where the tunnel is in earth or partly in earth and partly in rock.

The first of these allowances is sought to be justified in said agreement itself by a reference to a provision in the original contract of October 19, 1895, wherein it is provided: "When the tunnel is partly in earth and partly in rock, the contractor will be paid an additional price per cubic yard for rock excavation over and above the unit price per lineal foot of tunnel in earth." What the additional price would

be was left to be decided in case the conditions should arise. There is evidence tending to show it was conceded at the time by the city officials that the material called by the appellees "conglomerate," and by appellant "boulder clay" or "hard-pan," was of a character not provided for in the original contract. It appears from the evidence quite probable, as insisted by appellees' counsel, had the city officials not changed the direction of the tunnel—it is claimed without the knowledge of the contractors—this "conglom- erate" would not have been encountered. It was stated for information of bidders in the original specifications, "The following is an approximate length of tunnels * * * to be built under this contract, and the bids will be com- pared on this basis: * * * Section 3, two thousand feet of 8 ft. tunnel in earth; 18,000 feet of 8 ft. tunnel in rock." But after the city had changed the direction it appears that for a distance of more than 5,500 feet the tunnel ran through a substance which for purposes of tunnel excava- tion and construction, is like neither rock nor earth. The reason for the alleged secret change of directions is said to have been to prevent property owners from knowing whether the tunnel passed under or through their property, thus preventing suits for injunction and damages. At all events the city officials, acting under and approving the supplemental contract of May 17th, in effect conceded that the material in question had not been antici- pated or provided for. By the supplemental contract this so-called conglomerate is classified as "material encountered in earth tunnel that is rock, or of such a nature that it is classified as rock," and hence the excavation in it is treated as "tunnel partly in earth and partly in rock," bringing it under the clause in the original contract above referred to. This is the classification of the parties themselves, acqui- esced in by both the city and the contractors. It was, we think, under the evidence a proper and legitimate classifica- tion, entitling the contractors to an additional price per cubic yard under the contract unless, as now contended by the city, its officers had no power to fix or agree to pay such additional price by the original contract agreed to be

paid for excavation in material, part earth and part rock, without first re-advertising for bids therefor and reletting to a new lowest bidder.

The second of the allowances under the supplemental contract, that of $10 per cubic yard for extra or back masonry, is an entirely new provision, not based upon anything in the original contract. On the contrary, that contract provided that no such allowance should be made. The allowance rests, therefore, entirely on the validity of the supplemental contract. Its necessity arose, it is said, out of the nature of the so-called conglomerate, which there is evidence tending to show was such that the necessary blasting made a larger excavation than in solid rock, or than was necessary in mere earth tunnel, thus requiring more back masonry than contemplated by the original contract, and increasing the expense therefor.

Counsel for the city now contend that the contract of October 19th having been let to appellees as the lowest bidders in accordance with the statute, could not be changed in any respect by the municipal authorities without a new advertisement and reletting; that nothing can be added, that any change is void, and that there can be no recovery either under the supplemental contract or upon a *quantum meruit*. It is said if there is any exception to this rule it is confined to such work as is strictly incidental to the work let and necessary to make a complete structure.

The original contract provides that should the commissioner of public works deem it necessary to make any alterations which will increase the expense, such alterations shall not annul the agreement, " but the commissioner shall determine the value of the work so added," such value to be added to the contract price. It appears to be conceded that the line of the tunnel was in fact diverted from the original line where borings had been made to determine the character of the material through which the tunnel was to run. There was evidence tending to show that material changes were also made in the depth of the center line of the tunnel. It was on this ground, changes in the direction and depth of the tunnel, that the trial court sustained

the supplemental agreement of May 17th as a valid exercise of the authority given by the old contract to the commissioner of public works to be used in case alterations were made increasing the expense, viz, authority to determine the value of the work so added. It is clear, we think, that the commissioner of public works did so determine and did make an agreement embodied in the supplemental contract of May 17th, and that the city officials acted upon and ratified it so far as by their acts they could do so, although it was not signed by them. If that provision in the original contract authorizing the commissioner to determine the value of the work added by the alterations was valid, then the commissioner had power, we think, to make the supplemental agreement. It was held in County of Cook v. Harms, 108 Ill. 151–158, and re-affirmed in the City of Chicago v. Sexton, 115 Ill. 230–242, in reference to a similar provision, that it did not include within its meaning " any material departure from the plans and specifications, resulting in a new and substantially differing undertaking; " and it is said that the alterations intended must have been such " as were incidental to the complete execution of the work as described in the plans and specifications, and therefore of only minor and trifling importance, for otherwise some definite mode of determining what prices should be paid for them would also have been prescribed by the writing." In City of Elgin v. Joslyn, 136 Ill. 525–531, it is said : " Where the extra work and materials are of a different character from those specified in the contract, the rates named in the contract will not apply, and the party performing wlll be entitled to recover according to the value fixed by the evidence." In the present case the value was fixed and agreed upon between the contractors on the one hand and the representatives of the city on the other. If the agreement between the contractors and the commissioner of public works was made in good faith, and there is no question here but that it was, so far as the city is concerned, and gave a reasonable compensation, fair alike to both parties, for the extra material and labor made necessary by the alteration, it ought to estop the parties from now questioning

its amount. But the alterations in question did not, we think, involve any material departure from the original plans and specifications, such as to constitute, in the words of Mr. Justice Scholfield, "a new and substantially different undertaking." (City of Chicago v. Sexton, *supra*.) A change of direction in the tunnel and a change in depth might not under ordinary conditions make a material change in the cost of the work. It was because the formation of the underlying strata proved to be such that, as there is evidence tending to show, a new material, not considered by either party when the bids were made and the contract awarded, was unexpectedly encountered. This was more expensive material in which to construct the tunnel. The alterations which brought the tunnel into this material did therefore increase the expense, but this did not annul the original agreement and it became the duty of the commissioner to "determine the value of the work so added."

To have re-advertised and let a new contract, the work having been partly finished, and new conditions arising for which the contractors were not responsible, would have been impracticable. It would have involved a practical abandonment of the contract, exposed the city to payment of damages, created confusion, litigation, and delay. The emergency which had arisen was incidental to the prosecution of the work. The new material encountered called "conglomerate," might not continue for a long distance. It might be avoided by other changes in the grade or direction of the tunnel, which the commissioner of public works had power to make. The arrangement was not a new contract for new work within the meaning of the statute to cost more than $500. It was an agreement to pay a certain extra sum per cubic yard for excavation and extra masonry so long as the tunnel should continue in that particular material, which was apparently uncertain. If the price proved too high or the expenditure proved excessive, the city should have interposed, if it believed the arrangement improper. But instead of so doing, the city council expressly authorized the payments to be continued, indicating, at least, that it did not regard the price as excess-

ive. This authorization was approved by the mayor and concurred in by Controller Waller and Commissioner Mc-Gann who signed the contract of October 8th, evidencing the arrangement. Hence, the views expressed in Sanitary District v. Blake Manf. Co., 179 Ill. 167, are applicable. It is true the extra payment to which the contractors. became entitled under the allowance made by the city's representative, amounted in the aggregate to a large amount. But it is not shown to be more than the work was reasonably worth, nor is there any suggestion of fraud or dishonesty in making the agreement. There is no intimation that it was made with any other than honest motives. It is charged by the city that in carrying on the work, the contractors made the excavations larger than was necessary in order to get extra pay for extra masonry. This was a matter for consideration of the jury, and the evidence upon this point was before them when they rendered their verdict. But the good faith in making the agreement is not questioned.

While, therefore, the supplemental agreement of May 17, 1897, was not let to a new bidder nor formally ratified by the proceedings of the city council of July 11, 1898, it was nevertheless recognized as a contract, and did not, we think, require such letting or formal ratification. It was a contract which the city could lawfully make in view of the original agreement under the facts, and under the statute by a two-thirds vote, without advertising for bids. In Connett v. City of Chicago, 114 Ill. 233-239, it is said that no doctrine of the law is better settled than where the contract entered into on behalf of a principal is one which the principal himself might lawfully make, it may be ratified, and such ratification may be inferred from acquiescence after notice.

It is true that the contract in question was not formally executed by the city officials. But they acted upon and made payments according to the agreement of May 17th for a long period of time. These payments were recognized by the city council and continued by its direction, the council reserving only for submission to the courts the question of the legality and binding force of the agreement, but not

questioning the propriety or reasonableness of the arrangement. Although a thing be done in an improper way, which the city had power to do in a proper way, when it is done and accepted and enjoyed by the municipality, the latter must pay for what it would have had to pay for, had it got it in the right way. See Village of Harvey v. Wilson, 78 Ill. App. 544–551, and cases there cited. Cases are cited by counsel for appellant in support of the proposition that where a contract is let to the lowest bidder the city or its officials can not alter it, or add to the obligations of the municipality thereunder, without a new advertisement and reletting. They are generally cases arising upon statutory provisions differing from the statute of this State referred to, and involving facts different from the case at bar. We need not review them, but content ourselves by stating that we do not consider them in point in the present case. What is said, however, in one of them, Allen v. Rogers, 20 Mo. App. 290, though not precisely in point, is in general accord with views here expressed.

In the previous discussion we have considered incidentally many of the objections formally urged by counsel, and need not further review them in detail.

Whether or not the appellees were entitled to recover damages alleged to have been caused by alterations in depth and direction of the tunnel, aside from the extra compensation allowed by the supplemental contract, was a matter of determination by the jury under the evidence, and was properly so submitted. There was evidently considerable latitude in the admission of evidence, and some of the technical objections thereto should, in our judgment, have been sustained. But we are unable to discover that improper evidence calculated to do any real injury to appellant was admitted. There was an effort to bring out all the complicated facts, covering many details and controversies, and upon the whole the trial was, we think, not unfairly conducted.

The labor of this court would have been materially lightened, had the printed arguments, numbering some nine

City of Chicago v. McKechney.

hundred and fifty pages, been more condensed. We have, however, given the case our careful consideration, but for obvious reasons can not undertake to notice at length all the points to which our attention has been invited.

The judgment of the Circuit Court must be affirmed.

MR. JUSTICE HORTON:

I can not concur in the foregoing opinion. No recovery against a municipal corporation upon a contract for any public improvement, where the expense thereof exceeds $500, can be sustained, unless the same was let to the lowest responsible bidder as provided by statute.

Prior to May 17, 1897, appellees had been excavating a water tunnel under a contract with appellant. Differences had arisen between the parties and work was practically suspended. No reason is apparent why the work of completing said tunnel might not have been let to the lowest bidder as the law required. On the contrary, it seems to me, from the evidence, that there was no valid reason why this might not have been done. But, instead of so doing, the contract of May 17th was entered into between said city and appellees without competition, for the completion of said work. The amount to be paid under said second contract, as I understood the facts, is hundreds of thousands of dollars more than under the original contract.

It appears to me expediency does not justify what is, to my mind, a judicial annulling of an exceedingly valuable statute passed for the protection of the people.

Here the commissioner of public works changed the specifications in such manner as to make the work much more expensive, and then, without letting to the lowest responsible bidder, a contract for the work to be performed under the changed conditions was made with the original contractors by which the cost to the city was greatly increased. It may be that the price agreed upon was not excessive. As to this I express no opinion.