## Ezekiel Smith et al. v. Sanitary District of Chicago.

1. EVIDENCE—*Of Waiver of Time of Performance Fixed by a Contract.*—Where an employer allows a contractor to continue work after the time provided in the contract for the completion of the same, gives him further orders thereunder, and compels him to furnish additional material with no intimation of an intention to forfeit the contract, such conduct is evidence tending to show a waiver of the clause in the contract providing for the time of completion.

2. BUILDING CONTRACTS—*Provision for Extra Work Performed.*— Where a contract, as required by law, is advertised, and let to the lowest responsible bidder, and such contract contains a provision that if extra work, or work not provided for in the contract, is performed by the contractor before prices have been fixed for such work, then the engineer shall estimate the same at such prices as he shall deem just and reasonable, and his decision shall be final; a subsequent agreement for the doing of such extra work, or for the doing of any work that may be considered necessary by reason of the making of the contemplated or permissible changes, need not be let upon advertisement.

3. SAME—*Changes in Work Must Not Be a Material Departure from the Specifications.*—Where a contract for the construction of a canal reserved to a sanitary district the right to make alterations in the line, grade, plan, form, dimensions or materials of the work therein provided for, either before or after the beginning of construction, provided that if alterations were made, the general character of the work as a whole be not thereby changed, such provision does not contemplate the substitution of a cement retaining wall in place of a dry rubble wall as provided for in the contract.

Assumpsit.—Appeal from the Superior Court of Cook County; the Hon. ELBRIDGE HANECY, Judge presiding. Heard in the Branch Appellate Court at the March term, 1902. Reversed and remanded. Opinion filed April 14, 1903. Rehearing denied June 16, 1903.

Statement.—The work of the Sanitary District consisted of the construction of a sanitary and ship canal extending from the south branch of the Chicago river to Lockport, in Will county, a distance of about twenty-seven miles. The width of the canal was from 160 to 202 feet at the bottom, and it was about thirty feet in depth. For convenience of designation, the work was divided into sections of different lengths, and the sections sub-divided into stations of 100 feet, each numbered consecutively. This

suit involves section 14, extending from station 1420 to station 1480, a distance of 6000 feet. The material consisted of glacial drift and solid rock. On the twelfth day of July, 1892, a written contract for work on section 14 was entered into by and between the Sanitary District and the McCormick Construction Company, and in and by said contract it was provided:

" 1.   The work shall be executed under the supervision of the chief engineer of the Sanitary District, and by him the quantities and amounts of the several kinds of work performed under this contract shall be determined, and under his inspection all work shall be accepted or condemned; and he shall decide every question which may arise between the parties hereto relative to the execution thereof, and his decisions shall be final and binding upon both parties.

2.   The Sanitary District reserves the right to make railway changes independent of the main work.

3.   Whenever the top of the rock at the sides of the channel is below a level of five feet above datum, the sides above the rock are to be walled with dry rubble masonry. Before beginning the construction of the wall the surface of the rock is to be cleared of earth, foreign substances and loose rock, that the wall may be founded upon a clear, solid stratum. The walls in all cases to be built to a height of five feet above datum, with a thickness at the top of four feet. The retaining walls are to be built of stone taken out of the excavation; the face of each wall to be laid true to line, the stones being scabbled and carefully placed in a firm position without the use of small stones in their joints.

4.   The contractor will be required to remove all trees or other incumbrances within one hundred and fifty feet of the center line of the channel or that may be in the way of any collateral work specified. The cost of this work shall be included in the prices for excavation.

5.   Throughout such sections of the work as may require a change in the location of any railway, the contractor shall build a double track road-bed thirty feet wide on top, with material from the excavations, and the cost of such work shall be included in the prices of excavation.

6.   The contractor is to dispose of all material excavated at his own expense, and in the most convenient manner, on the right of way in waste banks, not nearer to the main channel than fifty feet.

7.   The contractor is to provide all pumping machinery

and operate the same at his own cost and expense at the time of excavation until the whole work is fully completed and inspected as provided in the contract.

8. All material excavated shall be classed under two heads: 'glacial drift' and 'solid rock.'

9. Whenever work is required to be done which is not contemplated and covered by the prices hereinbefore given, the engineer shall fix such prices for the work as he shall think just and equitable, and the contractor shall abide by such decision, provided he enters upon such work with full knowledge of the prices so fixed; but if the contractor declines executing such work at the prices fixed by said engineer, then the Sanitary District may enter into contract with any person for the execution.

10. In case the contractor fails to comply with the provisions of this contract as to progress and character of work, he shall be duly notified in writing, and thirty days after the giving of such notice the party of the first part may declare the contract forfeited, if there is substantial failure to comply with its provisions.

11. The Sanitary District reserves the right to make alterations in the line, grade, plan, form, dimensions or materials of the work therein provided for, either before or after the beginning of construction, provided, that if alterations are made, the general character of the work as a whole is not thereby changed. If such alterations diminish the quantity of work to be done, they shall not constitute a claim for damages, or for anticipated profits on the work that may be dispensed with; if they increase the amount of work, such increase shall be paid for according to the quantity of work actually done and at prices and rates established for such work under the contract.

12. All work provided to be done under the contract shall be completed and ready for inspection on or before April 30, 1896; provided, that if for any reason the contractor is not permitted by the Sanitary District to begin the excavation of the main channel on or before the first day of August, 1892, then the Sanitary District agrees to extend time for the completion a corresponding amount of time subsequent to August 1, 1892.

The work done each month shall not be less than such proportion of the whole work as one month bears to the total number of months agreed upon for the completion of the work, provided, the first four months after notice to begin shall be considered as one month, and the last two months as one month.

13.   In consideration of the said work being carried on and completed in the time and manner specified, the Sanitary District agrees to pay to the contractors as follows: For each cubic yard of glacial drift, twenty cents; of solid rock, seventy-three cents; of dry rubble masonry, $2.00.

14.   If the work under the contract should be abandoned by the contractor, or if the rate of progress is not such as to secure its completion within the time specified, the Sanitary District shall have the power to notify the contractor to discontinue all work or any part thereof as may be designated, and the Sanitary District shall thereupon have the power either to complete said work by contract, or to employ such men, teams and machinery as may be necessary to complete the work; and in so doing the engineer may use such tools and materials as may be found on the line of such work.   The cost of doing said work shall be charged to said contractor and the expense deducted and paid out of moneys due him, or that may become due him, and the balance shall be paid to him on demand."

After entering into the above contract, the McCormick Construction Company proceeded with the performance thereof until November 14, 1893, when it abandoned the work.   Through certain legal proceedings thereafter instituted, Patrick J. Sexton, receiver for the interests of the contractors and with the consent of the Sanitary District, assigned and transferred said original contract to Ezekiel Smith and Joseph Eastman, appellants herein.

At the same time certain stipulations additional to the original contract were entered into between appellants and appellee, and therein, on January 6, 1894, it was stipulated that the original contract was to remain in full force and effect; and further it was stipulated that an embankment thirty feet wide on top and to a level of eight feet above datum be constructed of glacial drift and be located 800 feet from the westerly edge of the main channel and parallel thereto throughout said section 14; and that said embankment be extended to a point not exceeding 4000 feet southward from the south end of said section; and that the embankment be constructed of glacial drift excavated from Red Mound near the north end of said section 14; and that a similar embankment be constructed on the easterly

Smith v. Sanitary District of Chicago.

side of the main channel, the center line of which shall be 150 feet east of the center line of the main channel parallel thereto, its northern extremity to be at or near station 1450, and it should extend southwardly to a distance not to exceed 4000 feet south of the southerly end of said section 14; that all trees and vegetable matter shall be removed from the bases of said embankments and the embankments herein provided for shall be fully completed on or before September 15, 1894, unless delayed by failure of the Sanitary District beyond May 1, 1894, to acquire possession of the land, and if so delayed, then the time for the completion of said embankment shall be correspondingly extended; in consideration the Sanitary District agrees to pay for the material entering into the whole of said easterly embankment and into such portion of said westerly embankment as lies outside the limits of said section 14, the sum of thirty-six cents per cubic yard, and for material in the westerly embankment lying within said section 14, no charge shall be made beyond the twenty cents per cubic yard for excavation; provided, that the material required for said embankments below said section 14 shall not be less than 100,000 cubic yards; and on each side of the main channel at an elevation of six feet above datum through Red Mound, a berme of fifty feet shall be left. Appellants (plaintiffs below) filed common and special counts, and a plea of the general issue to the entire declaration was filed October 24, 1901; a jury trial was begun November 11, 1901; defendant moved the court to exclude plaintiffs' evidence. This motion was denied, and on November 25, 1901, at the conclusion of all the evidence, defendant again moved the court to instruct the jury to return a verdict finding the issues for the defendant, which motion the court granted, and the jury returned a verdict finding the issues for the defendant.

Judgment was thereon entered and from that judgment this appeal has been taken.

W. J. HYNES and J. B. LANGWORTHY, attorneys for appellants.

Even where a contract contains a provision for forfeiture upon failure of the contractor to complete within the time specified, yet if the owner or employer permits the contractor to proceed after the expiration of the contract time, and work so done is estimated and paid for, the right to forfeit for failure to comply with the time provision is thereby waived. Henderson Bridge Co. v. O'Connor, 11 S. W. Rep. 18; Paddock v. Stout, 121 Ill. 571; Eyster v. Parrott, 83 Ill. 517; Walker v. London & N. W. R. Co., L. R., 1 C. P. D. 518; Murphy v. Buckman, 66 N. Y. 297.

JAMES TODD and PATRICK C. HALEY, attorneys for appellee; WALKER & PAYNE, of counsel.

MR. JUSTICE BURKE delivered the opinion of the court.

Appellants claim that they were unjustly and illegally prevented by the Sanitary District from completing the embankments and building the retaining walls for the drainage channel pursuant to the contracts mentioned in the foregoing statement and that they have thereby suffered large damages. The court instructed the jury to find the issues for the defendant and thereby held that there was no evidence in the case, together with all its legal intendments, which could justify the jury in returning a verdict for the plaintiffs.

Counsel for both parties have confined themselves mainly to an argument of the questions of law, and notwithstanding a record of more than 3000 pages we are enabled to dispose of the questions involved in this controversy without burdening this opinion with a long recitation of the evidence. The appellants entered upon and proceeded with the construction of these embankments until about the middle of December, 1894, at which time the chief engineer of appellee notified appellants in writing, that as a result of a consideration by the committee of finance and engineering, no further work would be permitted upon the embankments, "the time having expired in which you were to complete the work of levee construction." The supplemental contract provided that the work was to be

completed on or before September 15, 1894, except in case of delay by appellee. The question in controversy is, was appellee, under the circumstances of the case, justified in declaring a forfeiture of this portion of the contract relating to the construction of embankments? This question can best be answered by considering briefly the conduct of the parties. The total amount of the work of embankment provided for by the contract was to have been 436,371 cubic yards of glacial drift. At the time appellee stopped work thereon, about three-fourths of the embankments were completed. These embankments were to be constructed with glacial drift from the channel being cut through Red Mound. For the transportation of this material to the embankments, appellants claim that they expended on their plant to do this work, more than ten cents per yard on the entire amount, and therefore were in a position to have completed the work of the embankments at an additional cost to them of from five to seven cents per yard. There was therefore some evidence in the case affording a substantial basis for computing damages to appellants in not being allowed to complete the embankments, provided the element of time in their contract was not waived. The Sanitary District insist that any time after September 15, 1894, it had the right and power to declare a forfeiture of the contract and stop the work. On the other hand appellants claim that the element of time is not an essential element of the contract and that in any event the element of time has been waived.

Under the contract the superintendency of the work was given to the chief engineer of appellee, and the contract provided how rapidly, month by month, the work should proceed. The record shows that for various reasons the construction of the embankments, constantly under the eye of the chief engineer, did not proceed as rapidly as stipulated, so that on September 15, 1894, the work was far behind, and thereafter appellants continued their work on the embankments more rapidly, without protest, or objection of any nature whatever on the part of appellee, but

with its express approval; for on the 25th day of September, 1894, the appellee, knowing that the contract could not be completed strictly within the time limit, instead of declaring a forfeiture, directed appellants, at a great sacrifice, expense and inconvenience to themselves, to deposit material on section 14, instead of allowing them to continue the work in their own way. And it is further to be remembered that the appellants were paid every two weeks, and to ascertain the amount due them, appellee caused to be measured the work done by appellants under the contract up to the middle of December, 1894.

If appellee intended to insist upon the time element in the contract, it was unjust, as appears from the record, after the time limit had been passed, for appellee to remain silent as to its intention to forfeit the contract, and to give appellants orders thereunder, and compel them to supply material for section 14 at twenty cents per cubic yard, when they could have, with little more expense, furnished material for section 15 at thirty-six cents.

Bearing in mind, then, the failure of appellee to indicate in any way whatever to appellants that it would insist upon the completion of the embankments by September 15, 1894, and also bearing in mind the affirmative acts of appellee after the technical time limit had been reached, and the profits thereby coming to appellee and loss to appellants, we are of the opinion that there is much evidence in this record tending to show a waiver of the clause in the contract providing for the completion of the embankments on or before September 15, 1894. Paddock v. Stout, 121 Ill. 571; Eyster v. Parrott, 83 Ill. 517. It is not for us to say how a jury might finally decide the question of waiver of the time limit, but we do find that there is much evidence on this point which, under proper instructions of law, should have been submitted to the jury. The element of time was not specifically made the essence of the contract, nor do we think that the nature of the subject-matter was such as to render time of the essence of the contract. Bispham's "Principles of Equity," and cases there cited.

If the forfeiture clause in the original contract be invoked to warrant the action of appellee in attempting to forfeit the contract, it will be found that that clause is as follows:

"In case the contractor fails to comply with the provisions of this contract as to progress and character of work, he shall be duly notified in writing, and thirty days after the giving of said notice the party of the first part may declare this contract forfeited, if there is a substantial failure to comply with its provisions."

We find no evidence in the record tending to show that appellee complied with this provision for forfeiture. Indeed, it is worthy of much consideration as to whether there was, under the circumstances of the case, a substantial failure on the part of appellants to comply with the provisions of the contract in building embankments.

Appellants had expended a very large amount of money in machinery and roads and plant to construct the embankment, and had completed three-quarters of the same by measurement, at a time long before the Sanitary District could suffer loss without them. Many unexpected difficulties were met with in the prosecution of work on this great sanitary canal, and it does not appear to have occurred to the Sanitary Board to forfeit appellants' contract until certain other complications had arisen, and under the evidence in this case it can not be said as a proposition of law that the portion of appellants' contract relating to the building of embankments was properly and legally forfeited. Provisions for forfeiture are subject to a strict rule of construction. The steps pointed out by the contract for forfeiture must be strictly followed. The clause in the original contract providing for forfeiture does not provide that the party may forfeit a portion of the contract unprofitable to it and insist upon other desirable parts being executed.

. Upon an examination of the argument of counsel for appellee, we find little or no defense of the act of appellee in declaring a forfeiture, but counsel say that the supplemental contract of January 6, 1894, was illegal and void, because not let to the lowest responsible bidder, and base their contention upon the eleventh section of the act creat-

ing the Sanitary District, which provides that all contracts for work, the expense of which exceeds $500, shall be let to the lowest responsible bidder. The cases of Holden v. City of Alton, 179 Ill. 318, Sanitary District of Chicago v. Lee, 79 Ill. App. 159, and all the cases upon this point collated by the industry of appellee's counsel, hold, without exception, that where, by statute, municipal corporations are required to let contracts upon advertisement, the statute must be complied with. We apprehend, however, the question here is not whether the Sanitary District could let a contract for over $500 for an independent work, but rather, are the embankments incident to and so intimately connected with the work of the contract that they may be considered a part thereof, or changes and extra work in the technical sense of the terms. The amount involved in a change or in extra work does not determine whether the work comes under the inhibition of the sanitary district act, as is illustrated in this very case—a proposed change from dry rubble wall to a cement wall. The construction of these embankments was treated by the parties as extra work which became necessary and for which the parties had a right to stipulate under the reserved power in the original contract.

The parties to this contract were confronted with this situation: The necessity of the embankments over sections 14 and 15 was not anticipated, but later became apparent. The material to erect them was to be taken out of the channel in Red Mound, for which the District had contracted to pay twenty cents per yard simply for its removal, to be thrown upon the waste bank. It was found that this necessary work could be completed over section 14 without cost to the District, by adding but sixteen cents per yard for the material necessary to extend the embankments over section 15. Under the powers reserved in the contract, and owing to the nature of the work, it is our opinion that it may properly be classed under the head of necessary and extra work, for the doing of which ample power was reserved in the contract, and was incident to

the very character of the undertaking. We are therefore of the opinion that the evidence bearing upon the issues in the case involving the embankments should have been submitted to the jury.

Under the power to make changes reserved in the contract, appellee changed the line of the channel, which required the removal of a large additional amount of glacial drift by appellants, which appellee desired to be placed, not along the right of way on section 14 altogether, but a portion of it on section 15; and it was under these circumstances that the stipulation with reference to constructing embankments was made; and in our opinion section 11 of the sanitary district act did not require appellee to advertise to let said contract upon advertisement. The regularity of the conduct of the board in making this " stipulation " for the additional work will be presumed. The contract in question is not, upon its face, necessarily beyond the scope of the authority of the appellee, and in the absence of proof that the contract is beyond the scope of its authority, the contract will be presumed to be valid. We can not hold, as a proposition of law, that the construction of the embankments in question was not extra work stipulated for in the contract. The Sanitary District had the power to make the supplemental agreement providing for the construction of the embankments, and in this position we think we are sustained by the following authorities : City of Chicago v. McKechney, 91 Ill. App. 442; Drainage Commissioners v. Lewis, 101 Ill. App. 150.

It is claimed that the supplemental contract may be upheld as an agreement made upon the consideration of a compromise of a matter in dispute. For a decision of this case we have not found it necessary to examine the record upon this point. The compromise of a matter in dispute is sufficient consideration to uphold an agreement.

It is claimed that before appellants became parties to the contract, appellee insisted that under the terms of the contract the original contractor was bound to construct the embankment on section 14, and by him it was claimed

that the contract did not justify this interpretation; and therefore when appellants became parties to the contract the prices agreed upon for embankment were in part fixed by making definite the term of the contract providing the amount of compensation for the construction of embankments.

The respective claims and the contentions of appellee and the original contractor over the building of the embankments are set forth in a letter of September 5, 1893, which the court refused to admit in evidence. We think this letter should have been admitted in evidence, not in any way to affect the rights of parties, but as tending to show the purpose and good faith on the part of the board of trustees in removing this element of contention from the contract as finally made with appellants.

The next point urged by appellants for reversal of the judgment is the alleged error of the court in holding that appellee had the power and right, under the contract, to prevent appellants from constructing the dry rubble walls. The work directly contemplated by the original contract involved the excavation for the main channel and the construction of the retaining walls. Paragraph 5 of the original contract is as follows :

" Wherever the top of the rock at the sides of the channel is below a level of five feet above datum, the sides above the rock are to be walled with dry rubble masonry as soon as practicable after the channel is opened."

The contract fixes the price of excavating glacial drift at twenty cents per cubic yard, solid rock at seventy-three cents per cubic yard, and dry rubble masonry at two dollars per cubic yard. With reference to these three classes of work as one joint enterprise, the contract in this case was made. The retaining walls were not simply collateral, but were an integral part of the contract, and the prices for these classes of work were advertised for and made as one entire bid. It is evident that the prices were not fixed independently of each other, because the retaining walls were to be constructed of stone from the channel. Appellants in excavating would be required to lift the stone out

of the channel, and in so doing, with little additional expense, could place the stone in the dry wall. It is entirely reasonable to suppose that the price fixed for excavating the solid rock may have been made much lower because of the price bid and obtained for disposing of the stone almost in its native quarry at a price of two dollars per cubic yard. This question has been considered in County of Cook v. Harms, 108 Ill. 151, and in City of Chicago v. McKechney, *supra;* City of Chicago v. Sexton, 115 Ill. 230.

It appears that the officers of the Sanitary Board conceived the idea, after the work had been in progress some time, that cement wall was preferable to the dry rubble wall. Thereupon the appellants were directed not to lay the dry rubble wall, and they were offered for cement wall $3.25 per cubic yard. Much negotiation followed, appellants claiming that 'the cement wall was not worth much more than $3.25 per cubic yard, and that the board had contracted to pay more than that amount to other contractors. There was some evidence tending to show that appellee had found the work was worth more than $3.25 per cubic yard. No agreement was made between appellants and appellee, and appellee did not build any cement wall, and in this case claims damages in an amount equal to the difference between the cost to them of building dry rubble wall and two dollars per cubic yard.

Appellee defends against this claim for damages, and insists that the power was reserved by it to terminate the contract as to the dry rubble wall and substitute therefor the cement wall. If this change in the wall were but a slight and not a substantial modification of the original contract, it could be made. If it were to be found, after weighing the evidence, that the building of a cement wall was a work requiring the use of material not estimated in making the original bid and contract, and hence substantially different from the dry rubble wall, then the abandonment of the dry rubble wall could not be made by appellee without appellants' consent. In the Harms case it is said :

" We are not authorized to assume that the furnishing of these plans and specifications and the writing of these bids and proposals were intended either to entrap the unwary or as an idle and useless ceremony; but we must, on the contrary, assume that they were intended in good faith for the purpose of intelligently and *bona fide* making a contract for the construction of the foundation of the court house. If intended for that purpose, the work to be done would have to conform in all material respects to that described in the plans and specifications, and if materially variant therefrom, it would necessarily be a new and different work, because not within the contemplation of the parties when the contract was made. If there is only 'change,' 'addition,' or 'alteration,' the contract must govern; if there was more than this, it does not."

If the above doctrine did not obtain, then advertising for bids and the stipulating of prices in the contract would be useless. It was held in this case that the provision in the contract allowing changes was only intended to provide against those ordinary and comparatively unimportant departures which, during the progress of the work, might become necessary to effectually complete the work as provided in the contract, and which could not, at the date of the contract, have been anticipated, and therefore provided against.

A party entering into a contract to do a given work at stipulated prices can not, by the use of the words found in the contract under consideration, be made to do a different and more expensive work at prices to be named by the engineer or by the appellee.

In McMaster v. State of New York. 108 N. Y. 542, bids were submitted and contract for furnishing stone for the exterior facing of the walls for the building of an asylum was awarded, and the board of managers by their contract reserved the right to make any change they might deem proper, and that the work should be performed by the contractor for the compensation in the contract named unless such change would increase the expense, in which case the contractor should be paid a reasonable compensation, to be certified by the superintendent. After the contract was

let the board of managers decided to build certain parts of the walls of brick with sandstone trimmings. The action was to recover the loss of profits resulting from the change of plans. In that case it is said:

"It is difficult, probably impossible, to draw in advance a precise line between what is authorized by such a reservation and what is not. It authorizes such changes as frequently occur in the process of constructing buildings, in matters of taste, arrangement and details, but it does not authorize a change in the general character of the building. If it does, a contract carefully entered into could be mainly if not entirely frustrated."

In the case at bar the change from dry rubble walls to walls laid in cement was recognized by the engineer of appellee as the substitution of a new and different class of work. · As stated in the McMaster case, it is frequently difficult to draw a precise line between what is authorized under a clause of a reservation, but it must depend largely upon the facts of each case, and in our opinion these facts, under the proper instructions of law, should be submitted to a jury. If the building of a cement wall were little different from the building of a dry wall, the change, doubtless, was authorized by the reservation clause in question; but if the construction of the cement wall was radically different as to amount of labor required and additional and different material, and increased expense, then and in such case it might properly be held such a departure from the original contract, that it could not be made under the reservation clause without the consent of appellants. In either case we are satisfied from a reading of this record that there is evidence sufficient to have required the submission of the case to the jury. We understand from the abstract that appellants were ready and willing to build the cement wall, but not at the price fixed by appellee.

After a careful consideration of all the evidence bearing on this point, we are of the opinion that appellants should have been offered a reasonable compensation for building the cement wall, and it was error for the court to refuse to accept as evidence the public reports placed on file of ap-

pellee's committee, who, speaking for appellee, say what is such reasonable compensation, basing their opinion upon the reports of appellee's engineering department and the actual experience of the contractors working upon the channel. The report should go to the jury under instructions limiting its uses as evidence.

It is insisted by appellee that the action can not be maintained because the decision of appellee's chief engineer is adverse to appellants' claim. The contract provides:

"The chief engineer shall decide every question which may arise between the parties relative to the execution thereof, and his decision shall be final and binding upon both parties."

The authority cited by appellee clearly sustains the position that a contract voluntarily entered into, however unfair and oppressive it may be, can not be evaded or disregarded, unless for fraud clearly proved. But in the case at bar, it is quite evident that the engineer did not exercise his own judgment in contested matters, but took his orders from the Sanitary District and merely communicated them to appellants, and in instances where he did exercise his own judgment, it is a question to be determined by the jury from the evidence as to whether he did, in fact, in his word and conduct, decide adversely to appellants. He certainly allowed them to depart widely from the terms of the contract, with the knowledge, and therefore implied consent of appellee. We are clearly of the opinion that we are not justified in holding that the decisions made by the engineer or superintendent are a conclusive defense to appellants' claim. The solution of this question requires the application of the law and the evidence.

Several other items are set down in appellants' bill of particulars, in regard to which there are no involved questions of law or fact, and as this case is to be remanded we will refrain from commenting further upon the evidence. For the error directing a verdict for appellee, the judgment of the Superior Court must be reversed and the case remanded.